Filed 6/19/13  Certified for publication 7/10/13 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.M. et al., Persons Coming Under the Juvenile Court Law. | |
| LAKE COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>K.B.,<br><br>        Defendant and Respondent;<br><br>A.M. et al.,<br><br>        Appellants. | A136436<br><br>(Lake County<br>Super. Ct. Nos. JV320299A,<br> JV320299B) |

        The two children of respondent K.B. (Mother) and her boyfriend (Father) were detained by appellant Lake County Department of Social Services (Agency) after doctors found the younger child, a baby, to have several bone fractures.  At a contested jurisdictional hearing, a physician testified that the baby's injuries had been inflicted by a series of violent acts.  Although the parents were the baby's only caretakers, both of them professed bafflement as to the source of the injuries.  After finding the jurisdictional allegations true, the juvenile court bypassed reunification services for the parents under Welfare and Institutions Code[1] section 361.5, subdivision (b).  A few months later, Mother successfully sought modification of the order denying services on evidence she

_____

        [1] All statutory references are to the Welfare and Institutions Code.

had obtained a restraining order against Father and attended parenting classes. Because the juvenile court applied the wrong legal standard and failed to make necessary findings in granting reunification services to Mother, we reverse.

## I. BACKGROUND

Mother and Father's two children, S.M. and A.M., were the subjects of dependency petitions under section 300, subdivisions (a) and (j), both filed July 1, 2011. S.M., an 11-week-old boy, was detained on the allegation he was discovered, while in the care of Mother and Father, to have "multiple unexplained injuries" that were "highly suspicious non-accidental trauma." A.M., a four-year-old girl, was detained on the basis of the alleged abuse of S.M. In a subsequent report, the Agency stated neither parent was able to provide a "feasible explanation" for the injuries. The juvenile court detained the children, and a contested jurisdictional hearing was scheduled. A few days later, the Agency filed an amended petition with respect to S.M., adding allegations under section 300, subdivisions (b) and (e) similar to the existing allegations.

At the jurisdictional hearing, held six months after the children's detention and conducted over several days of testimony, S.M. was described by a pediatrician as having suffered seven separate bone fractures prior to his detention, one to each leg, an arm, and four ribs. Because some of the fractures showed evidence of healing at the time of discovery, the pediatrician concluded they were caused by two, three, or more separate incidents. The most recent fracture, a "complete break" of S.M.'s arm that left the bone in two pieces, occurred several days before S.M. was brought by his parents to the hospital for treatment. The injury would have been painful for S.M. both when it occurred and whenever his arm was later moved, since movement caused the broken ends of the fracture to "grind" against each other. As the pediatrician said, "Fractures are painful events and so clearly whoever was present at the time the fracture happened would have recognized that the child was in distress. . . . [A]nd by that, I mean crying and screaming and obviously being in pain."

In the six months after S.M. was detained, he had not suffered any further injuries, which tended to rule out disease or other organic causes for the fractures. Tests also

ruled out such problems. Rather, the pediatrician concluded, the cause of the injuries "was a series of aggressive violent acts directed towards the child. [¶] . . . [¶] . . . [V]ery, very, very few two-month-old babies have any fractures. Children this age with this many fractures are often dead because they've been injured so severely."

Mother testified that she and Father lived together with S.M. and A.M. but were not married. On the day of S.M.'s detention, she and Father had taken him to the hospital because he was unable to move his arm. Prior to that date, Mother had seen no indication that S.M. had been "physically traumatized" or had any broken bones. She said the handling and treatment of S.M. by Father and A.M. had always been appropriate, and she and Father had never left S.M. in the care of anyone else. Mother denied causing the injuries herself. She was unable to explain S.M.'s injuries, other than possibly as a result of a congenital condition that she believed had affected her brother—mistakenly believed, the testimony showed.

Father had similarly never seen any sign of trauma in S.M., prior to discovering the baby could not move his arm. Father denied mistreating or mishandling S.M. Father said he was a very strong person and engaged in physical play with S.M., but nothing "unusual" had ever happened during their play. S.M. had never cried as a result of it. Father was hampered in his handling of S.M. by a brace Father wore on his hand at the time, but he had never heard S.M. cry out when he handled him. On the day they took S.M. to the hospital, S.M. had caught his arm in Father's brace, but S.M. did not react as though he had been injured. Father had never seen Mother hurt either A.M. or S.M. He had no explanation for the injuries.

Father acknowledged having reported Mother to the police after she had repeatedly attacked him several years before, but he denied any other violence toward him by Mother. Father also acknowledged reacting very violently at the courthouse on the day of the detention hearing for S.M. and A.M.

The commissioner found true the jurisdictional allegations against the parents, noting the section 300, subdivision (b) allegations of abuse had been proved by clear and convincing evidence.

3

In the dispositional report, the Agency stated that Mother was found to have committed battery while a juvenile, in addition to having been arrested for spousal abuse. She reported that her own father and mother, over the course of a custody dispute, were verbally and physically abusive towards each other and towards her, and she had spent many years in psychological treatment, although she claimed not to have been diagnosed with a mental disorder. Father reported no history of abuse or counseling. Both continued to deny any responsibility for S.M.'s injuries. The Agency recommended the juvenile court deny reunification services, explaining: "[B]ased on the parents' failure to acknowledge any responsibility for the abuse, there are no services that are likely to prevent re-abuse." Finding clear and convincing evidence, the court adopted the recommendation of the Agency to deny reunification services to both parents. The court scheduled a permanency planning hearing pursuant to section 366.26.

In the report prepared for the section 366.26 hearing, the Agency recommended adoption by Father's parents as the permanent plan. The report attached an adoption assessment prepared by the Agency that expanded on the information previously available about the family. Drawing on existing Agency records, the assessment said Mother, as a child, "lived in chaotic homes wherein domestic disputes and various forms of physical violence were common," including possible sexual abuse of Mother. Mother had a mutually violent relationship with her father and stepmother, with whom she lived. The incidents of violence "grew in frequency and intensity as [Mother] entered puberty." She finally moved from that home at age 15 after "a physical altercation in which [Mother] injured her step-mother." Mother was hospitalized for psychiatric treatment the following year "following an escalation of physical altercations with her father." She later returned to live in her father's home, but she was arrested for assault after another fight in which she injured him. She was then placed in a group home, where her violent conduct appeared to subside.

The adoption assessment described Father's erratic conduct on the day of the detention hearing, when he violently threatened various court and Agency employees. At the time, Mother was heard to say, "He is always like this." Following the jurisdictional

4

hearing, Father threatened suicide and was hospitalized. He was later arrested for threatening to kill Mother and others during a violent confrontation. In a letter sent to the Agency's attorney, Father stated he "wasn't ready to be a dad" when S.M. was born and as a result made a "mistake" in handling S.M. Father said he "ha[d] some huge soul searching" to do before attempting to care for children again. The assessment also noted that A.M. had told caregivers Father "is mean and yells" and asked if they "could talk to her parents about spanking because 'they always spank me and hurt me.' "

The assessment contained a description of one visit between S.M. and his parents. According to the notes of the social worker, "[Father] removed the infant [S.M.] from the carrier seat and hugged the infant tightly, approximately 30 sec, [S.M.] began to scream loudly; [Father] bounced the infant harder and appeared to push the infant['s] face into his shoulder. The [visit supervisor] offered to take [S.M.] after watching the father struggle for about 10 MIN. [Mother] had made many attempts to ask for the crying baby and [Father] refused. . . . [Father] placed the infant on a bean bag and directed [Mother] to let the baby stay on the bag. [Father] left the room, and the [visit supervisor] watched [Mother]. [S.M.] stopped crying. After a few minutes [Mother] talked and played with the child but the [visit supervisor] noticed [Mother] did not pick up the child but she would grab the bean bag instead. Soon [Mother] pick[ed] up [S.M.] but just to reposition the child on the bean bag." When Father returned to the room, he picked up S.M., who immediately began to cry. When Father's mother took S.M. and comforted him, "[Father] turned red and refused to speak." Father's parents told the Agency, "the birth parents have an established history of volatile interactions with one another that is not healthy for the children to be around and that potentially puts the children at risk of further harm." The assessment concluded the parents "do not demonstrate the self-control and/or personal stability needed to sustain safe, effective and nurturing interactions in a larger context."

On the eve of the section 366.26 hearing, less than three months after the jurisdictional ruling, Mother filed a motion pursuant to section 388 for an order modifying the dispositional order to grant her reunification services. The motion was

5

accompanied by a declaration stating that, since the dispositional hearing, Mother had separated from Father and obtained a domestic violence restraining order against him. She had also "sought therapeutic services . . . in an effort to better understand the ill-effects of my relationship with [Father] as well as made an attempt to better understand myself," consisting of five "Seeking Safety" classes, five of eight parenting classes, and two sessions with a counselor. According to her declaration, Mother was still at a loss to explain what happened to S.M., although she noted Father "admitted he was alone with [S.M.] when one of his injuries occurred."

Mother testified at the hearing on her motion, held August 13, 2012, confirming the information contained in the declaration. Mother said she believed no longer being in a relationship with Father was "better for the children." When asked to explain, she said, "I believe that I can be a mom or a better mom just—it's hard to answer. . . . I think I can support my kids and everything on my own, and I don't think—I think that I can do it on my own." Mother continued to profess ignorance about the source of S.M.'s injuries and said she "would never believe that" Father harmed S.M. She acknowledged obtaining the domestic violence restraining order, but she said the "issues" of Father that motivated the restraining order arose after the Agency's detention of the children and as a result of the stress caused by it. Mother further contended that, but for the Agency's intervention, Father would have presented no risk to the children, saying, "[I]f the kids weren't taken away in the first place, we would not be having the problems we have now. So honestly, if [the Agency] never got involved, no, I do not [have concerns about Father's treatment of the children]."

When Mother was asked what she would do differently in the future to protect the children, she described the lessons learned in the classes she was taking, "what to look for if my children are ever being harmed and how to prevent it and what the steps are to prevent any kind of injuries happening on my children ever again." She also said she now had a bigger "safety net" of resources in the event she suspected abuse.

The juvenile court granted reunification services, explaining, "The change in circumstances that I see is that the mother has obtained the restraining order. She appears

6

to me to be making good progress in taking classes to better herself and become a responsible parent. And I think that at this stage of the proceedings reunification services for the mother are something that would very likely result in reunification."

## II. DISCUSSION

Both the Agency and the children's attorney have appealed the grant of reunification services to Mother, contending the juvenile court's finding of changed circumstances was not supported by substantial evidence and the grant of services was based on an incorrect legal standard.

The child dependency laws are "designed to allow retention of parental rights to the greatest degree consistent with the child's safety and welfare, and to return full custody and control to the parents or guardians if, and as soon as, the circumstances warrant." (*In re Ethan C.* (2012) 54 Cal.4th 610, 625.) To that end, "the general rule is that when a dependent child is removed from the parent's or guardian's physical custody, child welfare services, including family reunification services, must be offered." (*Id.* at p. 626; § 361.5, subd. (a).)

Notwithstanding this general rule, section 361.5, subdivision (b) lists a series of circumstances under which reunification services "need not" be provided to parents, referred to as a "bypass" of services. These comparatively extreme situations " 'reflect[] the Legislature's desire to provide services to parents only where those services will facilitate the return of children to parental custody.' [Citations.] When the court determines a bypass provision applies, the general rule favoring reunification is replaced with a legislative presumption that reunification services would be ' "an unwise use of governmental resources." ' " (*In re Allison J.* (2010) 190 Cal.App.4th 1106, 1112.)

In initially bypassing reunification services to Mother, the juvenile court relied on two section 361.5, subdivision (b) provisions. The first provision invoked by the court, subdivision (b)(5), applicable to S.M., allows the juvenile court to deny services if it finds "[t]hat the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent or guardian." In turn, section 300, subdivision (e) grants jurisdiction when "[t]he child is under the age of five years and has

7

suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child." Pursuant to section 361.5, subdivision (c), if a juvenile court finds the subdivision (b)(5) circumstances to be supported by clear and convincing evidence, the juvenile court is *prohibited* from granting reunification services "unless it finds that, based on competent testimony, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." (§ 361.5, subd. (c), 3d par.)

The second provision invoked by the juvenile court in denying reunification services to the parents, applicable to A.M., is section 361.5, subdivision (b)(6), which allows a court to deny reunification services upon finding "[t]hat the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of severe sexual abuse or the infliction of severe physical harm to the child, a sibling, or a half sibling by a parent or guardian, . . . and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian." Reunification services cannot be afforded to a parent who falls under subdivision (b)(6) "unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c), 2d par.) In making this "best interests" determination, the juvenile court "shall consider any information it deems relevant, including . . . [¶] (1) [t]he specific act or omission comprising the severe sexual abuse or the severe physical harm inflicted on the child or the child's sibling or half sibling; [¶] (2) [t]he circumstances under which the abuse or harm was inflicted on the child or the child's sibling or half sibling; [¶] (3) [t]he severity of the emotional trauma suffered by the child or the child's sibling or half sibling; [¶] (4) [a]ny history of abuse of other children by the offending parent or guardian; [¶] (5) [t]he likelihood that the child may be safely returned to the care of the offending parent or guardian within 12 months with no continuing supervision; [and] [¶] (6) [w]hether or not the child desires to be reunified with the offending parent or guardian." (*Id.*, subd. (i).) When subdivision (b)(6) applies,

"the juvenile court lacks the authority to order reunification unless it expressly makes [the best interests] finding by the requisite standard of proof." (*Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 107 (*Nickolas F.*).)

Although Mother sought reunification services by moving under section 388 for modification of the juvenile court's prior order, rather than directly under section 361.5, subdivision (a) at the time of the dispositional hearing, that did not excuse the court from following the requirements of section 361.5, subdivision (c) in granting reunification services to parents found subject to subdivisions (b)(5) and (6). Nothing in the language of subdivision (c) suggests the requirements need not be observed if services are requested at some time after the dispositional hearing has occurred. On the contrary, the language is absolute.[2] Further, section 388 merely authorizes the court to modify a prior order. It does not purport to excuse the juvenile court from satisfying any other legal requirements that might apply to the modification. Put another way, Mother could not evade the requirements of section 361.5, subdivision (c) merely by waiting a few months and then seeking relief under section 388. Mother does not contend otherwise; in supplemental briefing, her counsel agreed the trial court was required to make the necessary findings under section 361.5, subdivision (c) prior to granting services.[3]

As the minors' counsel points out, section 388 was amended in 2012 to make explicit the need for these section 361.5, subdivision (c) findings when services are sought by way of a petition under section 388. Our conclusion is based on the language

---

[2] Section 361.5, subdivision (c), second paragraph, states: "The court shall not order reunification" for a child subject to subdivision (b)(6) "unless the court" makes the required findings. Similarly, it states: "[T]he court shall not order reunification in any situation described in paragraph (5) of subdivision (b) unless it finds . . . ." (§ 361.5, subd. (c), 3d par.)

[3] By order of May 15, 2013, we requested supplemental briefing on the following issue: "whether the juvenile court was required, prior to granting respondent K.B.'s motion for reunification services under former Welfare and Institutions Code section 388, to make the findings required by Welfare and Institutions Code section 361.5, subdivision (c) before reunification services can be granted to a parent found to be subject to Welfare and Institutions Code section 361.5, subdivisions (b)(5) and (b)(6)." Mother's counsel answered "Yes" to this question.

9

of section 361.5, subdivision (c), rather than on this amendment, which did not become effective until after the events in question. Our conclusion, however, is consistent with the Legislature's expressed view that the amendment was declarative of existing law.

The juvenile court failed to observe the restrictions of section 361.5, subdivision (c) in granting reunification services to Mother. As noted above, the court was prohibited by subdivision (c) from granting services with respect to S.M., who was detained under section 300, subdivision (e), unless it found, "based on competent testimony, those services are likely to prevent reabuse . . . or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." (§ 361.5, subd. (c), 3d par.) No third party evidence was provided to the court concerning the nature of the services to be provided to Mother, much less demonstrating they were likely to prevent reabuse. Nor was there any evidence of a close and positive attachment with S.M., who was removed from Mother before he was three months old. Further, the juvenile court did not make, or even mention, the required finding.

Similarly, the juvenile court could not grant reunification services with respect to A.M. unless it made an express finding on clear and convincing evidence that reunification was in A.M.'s best interests, taking into consideration the various factors listed in section 361.5, subdivision (i). Although the juvenile court found changed circumstances, it made no express finding of best interests under any evidentiary standard, beyond noting, "at this stage of the proceedings reunification services for the mother are something that would very likely result in reunification." Further, there is no indication the juvenile court considered the factors of subdivision (i).

While acknowledging the need for findings under section 361.5, subdivision (c), Mother argues "any findings the juvenile court may have failed to make can be implied." On the contrary, under *Nickolas F.*, the juvenile court was required to make the necessary findings *expressly*. (*Nickolas F., supra,* 144 Cal.App.4th at p. 107.) As noted above, no express findings were made.

Mother also argues the juvenile court effectively made the necessary findings under section 361.5, subdivision (c) because "there is essentially no difference between a best interests determination pursuant to section 388 and a best interests determination pursuant to section 361.5, subdivisions (c) [*sic*]." We cannot agree. Regarding A.M., as to whom services were denied under section 361.5, subdivision (b)(6), the relevant subdivision (c) findings were required to be made under a clear and convincing evidence standard. Section 388 requires only a preponderance of the evidence. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) Even if the substance of the findings was the same, the evidentiary standard was quite different. Further, in making a best interests determination after a finding under section 361.5, subdivision (b)(6), the juvenile court is directed by subdivision (i) to consider a specific series of factors that are not necessarily applicable to an ordinary section 388 determination. Regarding S.M., as to whom services were denied under section 361.5, subdivision (b)(5), the juvenile court was required to make the specific finding that "services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." (§ 361.5, subd. (c), 3d par.) Neither of these is necessarily required for a best interests finding under section 388, and, as noted above, the juvenile court made neither finding.

Even if the necessary findings had been made, we would not have found substantial evidence to support them. With respect to S.M., as noted, there was no testimony to suggest that services would prevent Mother either from once again inflicting abuse, if she was the source of S.M.'s injuries, or permitting a domestic partner to do so. As the Agency noted in its dispositional report, there are no services that will prevent reabuse by a parent who refuses to acknowledge the abuse in the first place. Despite overwhelming evidence that S.M. had been brutally treated on more than one occasion and that either she or Father had inflicted the injuries, Mother was unwilling to acknowledge any source for S.M.'s injuries. Since Mother knows which of the two of them must have inflicted the injuries, her refusal amounts to a willful denial of the injuries themselves. In those circumstances, there is no reason to believe further services

11

will prevent her from inflicting or ignoring the infliction of similar injuries in the future. For the same reason, there is no evidentiary basis for finding by clear and convincing evidence that reunification with Mother would be in the best interests of A.M. (See *In re William B.* (2008) 163 Cal.App.4th 1220, 1229 [finding no substantial evidence to support a "best interests" finding in similar circumstances]; *In re Ramone R.* (2005) 132 Cal.App.4th 1339, 1348–1349 [same].)

Following oral argument, Mother filed a motion to dismiss supported by a request for judicial notice, arguing subsequent events had rendered the present appeal moot. We grant the request and take judicial notice of the April 12, 2013 status review report and the May 6, 2013 hearing transcript and minute order. Together, these documents demonstrate the Agency recommended, and the trial court granted, a further six months of reunification services to Mother following expiration of the period of services challenged in this appeal.

Although we have taken judicial notice of the requested documents, we find no merit in Mother's claim that the events reflected in them justify dismissal. For the reasons discussed above, the juvenile court could not lawfully grant reunification services to Mother without making the findings required by section 361.5, subdivision (c) on the basis of an adequate factual record. Neither the motion to dismiss nor the documents of which we have taken judicial notice suggest, in connection with the most recent grant of reunification services, that an evidentiary record was created to support the required findings or the juvenile court even purported to make them.[4] Accordingly, there has been no demonstration that a valid grant of reunification services has occurred. As for Mother's claim the Agency changed its position in recommending further services, the Agency's counsel made clear during the hearing before the juvenile court that the Agency continued to assert the validity of the position taken on this appeal. The recommendation

---

[4] The documents submitted by Mother refer to a set of findings made by the juvenile court, but these findings were not included in the request for judicial notice. In any event, there is no indication in the documents actually noticed that these findings included those required by section 361.5, subdivision (c).

12

of further services was an accommodation of the practical exigencies of the proceedings, rather than a legal concession.

Although the expiration of the period of reunification services directly challenged in this appeal may have rendered it technically moot, we exercise our discretion to rule on the appeal as one presenting " 'important question[s] affecting the public interest' that are ' " ' "capable of repetition, yet evading review." ' " ' " (*Brown, Winfield & Canzoneri, Inc. v. Superior Court* (2010) 47 Cal.4th 1233, 1240, fn. 1.)

## III. DISPOSITION

The August 13, 2012 order of the juvenile court granting reunification services to Mother is reversed. The case is remanded to the juvenile court with directions to enter a new order setting a permanency planning hearing under section 366.26 as soon as practicable.

_____
Margulies, Acting P.J.

We concur:

_____
Dondero, J.

_____
Banke, J.

13

Filed 7/10/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.M. et al., Persons Coming Under the Juvenile Court Law. | A136436 |
| LAKE COUNTY DEPARTMENT OF SOCIAL SERVICES, | (Lake County Super. Ct. Nos. JV320299A, JV320299B) |
|     Plaintiff and Appellant, | |
| v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| K.B., | |
|     Defendant and Respondent; | [NO CHANGE IN JUDGMENT] |
| A.M. et al., | |
|     Appellants. | |

THE COURT:

The opinion in the above-entitled matter filed on June 19, 2013, was not certified for publication in the Official Reports. After the court's review of requests under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.

Dated:

_____
Margulies, J.

Trial Court:   Lake County Superior Court

Trial Judge:   Hon. Arthur H. Mann

Counsel:

Anita L. Grant, County Counsel and Robert L. Weiss, Deputy County Counsel, for Plaintiff and Appellant.

Law Offices of Donna Wickham Furth, Donna Furth, under appointment by the Court of Appeal, for Appellant Minors.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Respondent.