Filed 9/8/15  In re L.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.M., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E063065 |
| Plaintiff and Respondent, | (Super.Ct.No. J255531) |
| v. | OPINION |
| J.M., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Christy C. Peterson, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, Kristina M. Robb, Deputy County Counsel, for Plaintiff and Respondent.

1

Appellant J.M. (mother) appeals from the juvenile court's denial of her Welfare and Institutions Code[1] section 388 petition regarding her child, L.M. (the child). We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On July 8, 2014, the San Bernardino County Department of Children and Family Services (CFS) filed a section 300 petition on behalf of the child, who was seven months old at the time. The petition alleged that the child came within section 300, subdivisions (a) (serious physical harm) and (b) (failure to protect). The petition included the allegations that, while in mother's custody and care; the child received an injury (a fracture); that mother engaged in domestic violence in the presence of the child; that the alleged father, J.G. (father),[2] failed to provide care, food and shelter for the child; and that father knew or reasonably should have known that the child was at risk of physical abuse while in mother's custody, but failed to protect him.

The social worker filed a detention report, which stated that CFS received a referral alleging physical abuse and general neglect. The child was brought to the hospital after he sustained a mid-left spiral fracture of his left humerus, which mother reported was the result of him falling from a bed to the carpeted floor. Mother told the hospital worker she was in the bathroom painting her nails, when she heard a "thud" and

_____

[1]  All further statutory references will be to the Welfare and Institutions Code, unless otherwise noted.

[2]  Father is not a party to this appeal.

2

crying. Mother said she was the only one at home at the time and said her boyfriend was at the store. Mother found the child on the floor, with his left arm injured. When she touched his arm, he began to cry louder, so she called 911.

The social worker met with mother at the hospital. Mother again reported that she was the only one home when the child fell off the bed. Mother stated that no one hurt the child and reiterated that he fell off the bed.

The social worker interviewed Dr. Adam Hutchinson at the hospital. He examined the child upon admittance and found that the child sustained a spiral fracture to the humerus in his left arm. It was the doctor's opinion that the child could not have sustained the injury from falling off the bed, since the type of injury he sustained required excessive force. Thus, Dr. Hutchinson requested a consultation with a forensic doctor.

The next day, the social worker went to mother's home and met with J.P., mother's boyfriend. J.P. said that he was in the home when the child was injured. He said mother was in the bathroom painting her nails, and the child was with her. J.P. then took the child into the room with him. When they were on the bed, the child started to cry and tried to get away from him. J.P. said he was holding the child's leg, but once the child started crying more, he let go. J.P. said he turned around to grab a few things, and the child fell off the bed. He stated that he did not hurt the child. Later in the interview, J.P. said the child was always falling and getting hurt and that mother was not a good mother. He said he and mother argued a lot in front of the child, and when she was upset with him, she would allow the child to get hurt (e.g., fall off the bed).

3

After interviewing J.P., the social worker talked to mother again. Mother then admitted that she lied in the first interview. She said she was scared for her boyfriend and did not want him to be blamed for the child's injury. Mother said that J.P. was in the kitchen when the child fell off the bed. She stated that she did not leave the child alone with J.P., but was always with him.

The social worker further reported that Dr. Mark Massi examined the child and opined that he had an oblique fracture to his left arm and that the injury was non-accidental. He said the child could not have sustained this injury from falling off the bed onto carpeted flooring. He also said the child had an old fracture to the ulna and radius to his left arm, as well. That fracture occurred about one or two months prior and was in the process of healing. Dr. Massi stated that it would take significant force for the child to have sustained these fractures. Dr. Massi suspected physical abuse and neglect, including nutritional neglect.

A detention hearing was held on July 9, 2014. The court detained the child in foster care. It also ordered visitation to be twice a week.

On July 29, 2014, the social worker filed an amended section 300 petition, adding an allegation under section 300, subdivision (e) (severe physical abuse). The amended petition alleged that, while in mother's custody and care, the child received an acute, left humerus fracture.

4

*Jurisdiction/disposition Report and Hearing*

The social worker filed a jurisdiction/disposition report on July 28, 2014, recommending that the court declare the child a dependent and that reunification services be provided to mother. The social worker reported that mother said she had only left the child alone with J.P. one time, in February 2014. She said that, after that time, the child always seemed frightened around J.P. and would cry incessantly whenever he was around him or tried to hold him. Mother had concerns about the child's fear of J.P. Mother further told the social worker that she and J.P. had a domestic violence relationship, and he was verbally abusive most of the time. She used to stay quiet and let J.P. yell at her, but recently, she began to argue back. They would end up yelling at each other, often in the presence of the child. Lately, their arguments seemed to occur daily. Mother said that on one occasion, J.P. almost hit her. Mother reportedly said at the time of removal that she would get a restraining order against J.P.; however, as of the writing of the report, she had not followed through.

Regarding visitation, the social worker reported that visits had gone well, the child appeared happy to see mother, and mother was appropriate during visits.

On July 30, 2014, the court held a jurisdiction/disposition hearing. Mother denied the allegations in the amended petition and set the matter contested. County counsel informed the court that it was changing its recommendation to no reunification services for mother.

On August 4, 2014, mother requested, and was granted, a temporary restraining order against J.P. until the jurisdiction/disposition hearing.

The social worker filed an addendum report on August 21, 2014, recommending that mother not be provided with reunification services, pursuant to section 361.5, subdivision (b)(5) and (6). The social worker expressed that she was concerned with mother's willingness and/or ability to protect the child from future harm. During the initial investigation, mother lied to the investigating social workers about the whereabouts of the alleged perpetrator, J.P., in order to protect him. Mother told the social worker that she was not protecting J.P., but in fact lied because she was afraid for herself. The social worker was also concerned because mother admitted that she was in a domestic violence relationship, yet continued to have J.P. in her life and around the child. Mother ignored warning signs that J.P. may have been hurting the child. The social worker noted that the child sustained a fracture a few months ago to the same arm, and it went undetected and untreated.

The court held a contested jurisdiction/disposition hearing on September 4, 2014. Mother testified at the hearing and said she and J.P. were dating and had been living together since the time the child was born in November 2013. He started being verbally abusive with her around January 2014. He would yell and scream at her, and he threatened to hit her once, in front of the child. Mother testified that one or two months before the child was removed from the home, she had left the child alone with J.P. After that time, the child started reacting to J.P. differently. When J.P. held him, he would cry

6

more intensely and fearfully than before. Mother admitted that, on the day of the incident, she reported to the hospital staff and social workers that J.P. was not at home when the child was injured. Mother said she did not think J.P. had done anything to the child, and she did not feel the need to cover for him. She said she lied simply because she was scared and overwhelmed. When mother was confronted with J.P.'s admission that he was at home when the incident occurred, she then told the story that he was there, but not in the bedroom. She agreed that she said J.P. was not in the room to avert suspicion from him. When asked why she finally admitted the truth, mother said she realized that her lie "caught up with" her. Mother testified that she now believed J.P. broke the child's arm and that he caused the older fractures as well. Mother agreed there were signs that J.P. could become violent. She said he would get agitated easily and was very impatient. In addition, mother testified that she completed a 13-session parenting course.

The social worker testified at the hearing, as well. She recommended no services for mother, due to the severity of the child's injuries. She said the child had three broken bones, from at least two separate occasions. The social worker said that she observed one of mother's visits with the child, and that mother was very attentive to him and played with him.

The court found that the child came within section 300, subdivisions (a), (b), and (e), and declared him a dependent of the court. The court said there was no question that there was severe, physical abuse and that there were three fractures involved. It stated

7

that two of the fractures went undetected and untreated, until the most recent humerus fracture led to the hospital visit. The court stated there was no evidence that services would be likely to prevent reabuse. The court noted that all it had was mother's testimony, but "most of it [was] a wish and the mother's thoughts as to what she believes can happen." The court stated that, judging from the credibility of the witnesses, it was very clear that mother was protecting J.P., and to some extent, was still protecting him. The court did not believe mother when she said she did not intentionally mislead people when she gave several different stories about the incident. As to mother's relationship with the child, the court noted it had evidence that the visits went well and there was an apparent attachment. However, given the child's age, the court did not believe the relationship rose to the level that the failure to try reunification would be detrimental. The court noted that, although the child had only been with the current caretaker for two months, the placement was stable, and it addressed the need that the child had for continuity. The court considered all the reports and testimony, and found that the burden had not be satisfied to show that services were likely to prevent reabuse, or that the failure to try reunification would be detrimental to the child because of the close attachment to the parent. The court further found that the child was severely abused, and it was not in his best interest to offer services to mother. The court denied reunification services, pursuant to section 361.5, subdivision (b)(5) and (6), and it ordered visitation to be one time a week. The court also set a section 366.26 hearing.

8

On December 4, 2014, CFS informed the court that the child was placed in a concurrent planning home on December 2, 2014. He was placed in the home of his third cousin, Eva C.

*Section 366.26 Report*

The social worker filed a report pursuant to section 366.26 on January 5, 2015, and recommended that parental rights be terminated and the permanent plan of adoption be implemented. The social worker reported that mother had supervised visits one time a week, and the child responded well to her. Mother was appropriate during visits. The social worker noted that, at time of the report, the child had been in his prospective adoptive home for one week. Although the relationship was new, Eva C. (the prospective adoptive mother), reported that she and her children were "completely in love with [the child]." The child was making a smooth transition to his new home, and he sought out the prospective adoptive mother frequently to be picked up briefly and then let down to explore his environment. The prospective adoptive mother felt that she was suited to adopt the child because she could provide him with a good home, and with a lot of love and attention. She was committed to raising him to adulthood.

On January 9, 2015, the court held a section 366.26 hearing, and mother set the matter contested. The court continued the hearing to March 6, 2015.

*Section 388 Petition*

On February 6, 2015, mother filed a section 388 petition, requesting that the court order reunification services for her. As to changed circumstances, mother alleged that

9

she completed a 13-week parenting class and a domestic violence class. She was also participating in counseling, and she enrolled in college. She further alleged that she had attended all visits with the child, and they went well. As to best interest of the child, mother alleged that she loved her son very much, and he loved her. She also felt that she was now fit and capable of caring for the child, and that if the court did not order services, it would be detrimental to him, since they had a close bond. Mother attached a letter from her therapist stating that she was "on the road to recovery" and was motivated to get back to caring for her son. The therapist reported that mother was "making steady progress at facing up to her issues in an honest and forthright manner."

The social worker filed a response to mother's petition and continued to recommend the termination of parental rights. The social worker reiterated that mother exposed the child to J.P., even though she knew the child showed discomfort around him. Moreover, when mother learned of the physical abuse, she did not protect the child, but lied and covered for the perpetrator. With regard to the bond mother claimed to have with the child, the prospective adoptive mother reported that during some of the visits, the child would hit and bite mother and pull her hair. She also reported that, at some visits, the child did not want to go to mother. He would not leave the prospective adoptive mother's side. The prospective adoptive mother further stated that the child showed no distress when mother departed from the visits. The child was thriving in the prospective adoptive mother's home, and he responded well when she consoled him after nightmares. The social worker opined that the child appeared to identify the prospective

10

adoptive mother as the primary parent, and that it was highly unlikely that he would suffer any detriment if mother's parental rights were terminated.

*Sections 366.26/388 Hearing*

The court held a contested, combined hearing pursuant to sections 388 and 366.26 on March 6, 2015. Mother testified on her own behalf. She talked about the parenting course and domestic violence course that she had completed. She said that she did not consider herself a victim of domestic violence before taking the class, but now she did. She thought her relationship with J.P. was normal, but learned that the verbal and emotional abuse and constant criticisms were considered domestic violence. Mother also learned from her parenting class about different principles, such as attachment, empathy, discipline, and having a healthy lifestyle. When asked how the child showed his attachment to her, mother said she knew he felt bonded to her because of the way he looked at her and how they played with each other. When asked how she would parent differently now, mother said she would tend to all of the child's needs. Mother said that she had learned to be honest with her feelings, through her counseling sessions. When asked whether it would be in the child's best interests for the court to offer her services, mother answered that it would be, since she realized she made a big mistake in failing to protect him. She felt that if she were given services, she could get a second chance to prove that she was capable of taking care of her son. When asked how the court could be sure she would protect the child, mother said she now understood what she had to do in order for the child to have a safer environment to live in. On cross-examination, mother

11

said she did not know why she lied about J.P. not being home at the time of the incident. Mother said that when she lied, she was not trying to protect J.P. However, upon further questioning about her lies, she finally acknowledged that she was trying to shield J.P. from suspicion. When asked whether the reason she did so was because she knew in her heart that he had done something wrong to the child, she replied, "No. Not, not at all." With regard to visits, mother admitted that there were times when the child sought comfort from the prospective adoptive mother, and there were a couple times then he was reluctant to leave her. Mother further testified that she never knew the child broke his arm the first time, and he was never treated then.

After hearing testimony and arguments from counsel, the court denied mother's section 388 petition. The court felt that mother's therapist said it best when he said mother was making steady progress. The court stated that her circumstances were changing, but had not changed. The court said that mother's testimony indicated she was looking to CFS for more services, and she was on a journey, and that, since the jurisdiction/disposition hearing, she had "entered a number of things" that were starting to change for her. However, the court noted that it had only been six months. With regard to the best interest of the child, the court cited *In re G.B.* (2014) 227 Cal.App.4th 1147 (*G.B.*), which held that, when there was severe physical abuse and reunification services were bypassed because of it, the focus of the dependency turned to the child's need for permanency and stability, instead of reunification. Moreover, there was a requirement of competent testimony that services were likely to prevent reabuse or that

12

the failure to try to reunify would be detrimental to the child because he was closely and positively attached to the parent. The court noted that the evidentiary burden was heightened at any section 388 petition hearing requesting services, and it required findings by clear and convincing evidence. The court found that mother had not met her burden of proof. It acknowledged that mother visited the child, the visits went well, and she loved the child. The court also noted that mother recognized that the child sought comfort from the prospective adoptive mother, and that he had no reaction when visits with her ended. The court further observed that there was no evidence from mother's therapist showing that services would prevent reabuse or that there was a close and positive attachment to mother. Therefore, the court denied the petition.

The court then proceeded to the section 366.26 hearing and heard argument from mother's counsel that the beneficial parental relationship exception (§ 366.26, subd. (c)(1)(B)(1)) applied. The court rejected that argument and found it likely that the child would be adopted. The court then terminated parental rights and ordered adoption as the permanent plan.

ANALYSIS

The Court Properly Denied Mother's Section 388 Petition

Mother argues that the juvenile court abused its discretion in denying her section 388 petition, since she had shown a change of circumstances. She no longer had the same beliefs and attitudes about domestic violence, her relationship with J.P., and her failure to protect the child. She further contends that it was in the child's best interest to

grant her services because it would have allowed him the opportunity to reunify with her and preserve their parent-child relationship. It would have also given her the chance to show her ability to protect him from future harm and to "continue her personal work." We conclude the court properly denied mother's petition.

A. *The Court Did Not Abuse its Discretion*

A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new or changed circumstances exist, and (2) the proposed change would promote the best interest of the child. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 316-317 (*Stephanie M.*).) A section 388 petition is addressed to the sound discretion of the juvenile court, and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion. (*Id.* at p. 318.)

However, "[w]hen a juvenile court bypasses reunification services due to a finding that a child suffered 'severe physical abuse' (§ 300, subd. (e)), the focus of the dependency proceedings turns to the child's need for permanence and stability instead of family reunification. [Citation.] Once severe abuse has been found, a court is '*prohibited* from granting reunification services "unless it finds that, based on competent testimony, those services are likely to prevent reabuse . . . or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." ' [Citation.] Stated another way, in the 'comparatively extreme situation[]' when a child is the victim of severe abuse, the legislative presumption is that services are not to be provided to the parent. [Citation.] When this presumption applies,

14

the evidentiary burden is heightened at any hearing to consider a section 388 petition requesting reunification services.  In such a case, a juvenile court may modify an order denying reunification services only if there is clear and convincing evidence that the services would be in the child's best interests, and only if it makes the same findings that would have been required to offer services at the disposition hearing instead of bypassing services." (*G.B.*, *supra*, 227 Cal.App.4th at pp. 1157-1158.)

1. *Mother Failed to Show Changed Circumstances*

The juvenile court here did not abuse its discretion in denying mother's section 388 petition, as she failed to show changed circumstances.  She alleged that she had completed a 13-week parenting class, a 10-week domestic violence class, and that she had been attending counseling for approximately four months.  She also alleged that she attended all visits with the child, and that she had enrolled in college.  However, at the time the court denied her services, mother had already completed the parenting class and was attending visits.  Thus, those were not actually changed circumstances.  Moreover, when the court denied mother services, it was concerned that she was in a domestic violence relationship with J.P., yet she lied to several people about his presence in the home at the time of the incident.  Moreover, when questioned about it, she said she was not trying to protect him.  However, the court found that mother was protecting him and, to that day, was still protecting him.  Significantly, at the section 388 hearing, mother still somewhat disagreed that she was trying to protect J.P. by her lying.  Only after more questioning, and denying several times that she was trying to protect him, mother finally

admitted that she was trying to deflect suspicion from him. Thus, even after completing a domestic violence course, a parenting class, and participating in counseling, mother was still in denial about her attempts to protect J.P. This evidence clearly showed, as the court found, that there were changing circumstances, but mother's circumstances had not changed.

2. *Mother Failed to Meet Her Heightened Burden of Proof That Services Were Likely to Prevent Reabuse*

In initially bypassing reunifications services, the court relied on section 361.5, subdivision (b)(5) and (6). With regard to section 361.5, subdivision (b)(5), "the juvenile court is *prohibited* from granting reunification services 'unless it finds that, based on competent testimony, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent.'" (*In re A.M.* (2013) 217 Cal.App.4th 1067, 1074-1075 (*A.M.*), see § 361.5, subd. (c).) With regard to section 361.5, subdivision (b)(6), services cannot be provided "'unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child.'" (*A.M.*, at p. 1075.)

We note mother's claim in her reply brief that the juvenile court here erred when it required her to meet the evidentiary burdens of proof contained in section 361.5, subdivision (c), and show that services were likely to prevent reabuse and that failure to try reunification would be detrimental because the child was closely and positively

16

attached to the parent.  In support of her position, mother relies on *In re L.S.* (2014) 230 Cal.App.4th 1183 (*L.S.*).  However, *L.S.* is distinguishable.  In that case, the parents' petition for modification sought to modify an order bypassing reunification services, based on section 361.5, subdivision (b)(11) and (13).[3]  (*L.S.*, at p. 1194.)  In the instant case, mother sought to modify the court's order bypassing services under section 361.5, subdivision (b)(5) and (6).

Moreover, *A.M.*, *supra*, 217 Cal.App.4th 1067 is directly on point.  The court there expressly held that, although the mother in that case sought reunification services "by moving under section 388 for modification of the juvenile court's prior order, rather than directly under section 361.5, subdivision (a) at the time of the dispositional hearing, that did not excuse the court from following the requirements of section 361.5, subdivision (c) in granting reunification services to parents found subject to subdivisions (b)(5) and (6).  Nothing in the language of subdivision (c) suggests the requirements need not be observed if services are requested at some time after the dispositional hearing has occurred.  On the contrary, the language is absolute.  Further, section 388 merely

---

[3]  Section 361.5, subdivision (b)(11), provides that services need not be provided to a parent when the court finds that his/her parental rights "over any sibling or half sibling of the child had been permanently severed, . . . and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent." Subdivision (b)(13) provides that services need not be provided if the parent "has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment described in the case plan required by Section 358.1 on at least two prior occasions, . . ."

17

authorizes the court to modify a prior order.  It does not purport to excuse the juvenile court from satisfying any other legal requirements that might apply to the modification.  Put another way, Mother could not evade the requirements of section 361.5, subdivision (c) merely by waiting a few months and then seeking relief under section 388." (*Id.* at pp. 1075-1076, fn. omitted.)  Although the court in *L.S.*, *supra*, 230 Cal.App.4th at page 1195 disagreed with the reasoning in *A.M.*, as mother points out, we choose to follow the *A.M.* court's reasoning.

We further note that, in her opening brief, mother applies the requirement and reasoning set forth in *A.M.*  She first argues the evidence showed that services would likely prevent reabuse.  However, she mostly relies on her own, self-serving testimony that she acknowledged that J.P. caused the child's injury, and that he had "brutally treated" the child on more than one occasion.  She also points to her testimony that she acknowledged that she ignored warning signs about J.P. and that she lied to protect him from suspicion.  She also cites her testimony concerning the warning signs of domestic violence and other things she learned in her domestic violence class.  Mother then asserts that none of the factors indicating that services were unlikely to be successful, as identified in section 361.5, subdivision (c), existed in this case.  Such factors include the "failure of the parent to respond to previous services, the fact that the child was abused while the parent was under the influence of drugs or alcohol, a past history of violent behavior, or testimony by a competent professional that the parent's behavior is unlikely to be changed by services." (§ 361.5, subd. (c).)

18

While there may not have been evidence of the factors listed in section 361.5, subdivision (c), there was also no competent testimony presented that services were likely to prevent reabuse, as required. (§ 361.5, subd. (c).) When asked how the court could be sure she would protect the child, mother simply said she now understood what she should have done to have a safer environment, and she felt like, now that she knew, she could provide the child a safe environment to live in. As the court pointed out, it had only been six months since the jurisdiction/disposition hearing, and there was nothing in the letter from mother's therapist with regard to services preventing reabuse. The therapist noted that mother was planning on attending more psychotherapy sessions, and she "appear[ed] to have the motivation [and] will to get back to caring for her son." This evidence did not show that more services were likely to prevent reabuse. To the contrary, the fact that mother continued to deny her attempts to protect J.P., even after having completed a domestic violence class and some counseling, indicated that additional services would not prevent reabuse.

Mother asserts that there was "no testimony by a 'competent professional' that [her] behavior was *unlikely* to be changed by services." (Italics added.) However, it was not CFS's burden to show that services were unlikely to change her behavior. Rather, there was a legislative presumption that services were *not* to be provided to mother, and she had the heightened burden of overcoming the presumption. (*G.B.*, *supra*, 227 Cal.App.4th at pp. 1157-1158.) We agree with the court that mother failed to overcome that presumption.

19

3. *The Child Was Not So Closely and Positively Attached to Mother That the Failure to Try Reunification Would Be Detrimental to Him*

The court here was required *not* to order reunification services, unless it found that services were likely to prevent reabuse *or* "failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." (§ 361.5, subd. (c).)

Mother claims that the child was closely and positively attached to her. In support of her position, she merely points to testimony that the child recognized her at visits and was excited to see her; he was affectionate with her; she was appropriate with him; he looked to her for comfort; and the visits essentially went well. She also points to her own testimony that she always felt she had a close bond with the child. However, while the visits may have gone well, the evidence also showed that during some of the visits, the child would hit and bite mother and pull her hair. Moreover, at some visits, the child did not even want to go to mother, and he would not leave the prospective adoptive mother's side. The prospective adoptive mother reported that the child showed no distress when mother departed from the visits. Mother herself admitted that, during visits, there were times when the child sought comfort from the prospective adoptive mother, and there were a couple times he was reluctant to leave her and go to mother. In addition, we note that the child was thriving in the prospective adoptive mother's home. The social worker said he appeared to identify the prospective adoptive mother as the primary parent, and it

was highly unlikely that he would suffer any detriment if mother's parental rights were terminated.

In view of the evidence, the court did not abuse its discretion in finding a lack of clear and convincing evidence that it would be detrimental to the child not to try reunification due to a close and positive attachment to mother.

4. *The Court Properly Found That Reunification Was Not in the Child's Best Interest*

In any event, as mother concedes, when a party petitions a court to modify an order denying services pursuant to section 361.5, subdivision (b)(5) or (6), the court can modify the order denying services "only if the court finds by clear and convincing evidence that the proposed change is in the best interests of the child." (§ 388, subd. (a)(2); see also *G.B.*, *supra*, 227 Cal.App.4th at p. 1158.) In support of her argument that it was in the child's best interest for the court to grant services, mother again points to her own testimony that she now knew the warning signs of abuse, and that she should have ended her relationship with J.P. sooner. She also admitted that she "allowed another person to control her," and that she failed to protect her son. Mother further points out that she was not the perpetrator of abuse, she was no longer communicating with J.P., and the reason leading to the dependency "was, in a matter of speaking, gone." She concludes that granting her petition would have served the child's best interest "by allowing him the opportunity to reunify with [her] and to preserve their parent-child relationship."

21

Although mother claims that she learned from her parenting and domestic violence classes, her testimony demonstrated that she was still reluctant to admit that she lied to protect J.P. She only admitted so after further questioning on the matter. Thus, even though she was no longer in contact with J.P., the problem was mother's failure to recognize the danger she was exposing the child to and her failure to protect him. The fact that she still had a difficult time admitting she was covering for J.P. shows that she had not completely changed. As her therapist opined, mother was "involved in taking the appropriate steps toward becoming a better person [and] a good mother," and she was still "on the road to recovery."

Furthermore, mother's claim that it was in the child's best interest to grant her services simply because it would allow him the chance to reunify with her has no merit. When a juvenile court bypasses reunification services due to a finding that a child suffered severe physical abuse, pursuant to section 300, subdivision (e), "the focus of the dependency proceedings turns to the child's need for permanence and stability instead of family reunification." (*G.B.*, *supra*, 227 Cal.App.4th at p. 1157.) The court here properly considered the child's need for permanence and stability, rather than reunification. Again, the child was thriving in the prospective adoptive mother's home, and the evidence indicated that he was bonded with her, as he identified her as the primary parent. While acknowledging the shift from reunification to the child's need for permanency and stability, mother still asserts that "section 388 provides the scheme to shift the focus back to family reunification when the circumstances justify reviving the

reunification issue, as was the case here." Mother cites no authority for this proposal. On the contrary, because the court here found that the child suffered severe physical abuse (§ 300, subd. (e)), the focus became the child's need for permanence, not reunification. (*G.B.*, *supra*, 227 Cal.App.4th at p. 1157.) We further note that "[t]he best interests of the child are not served by merely postponing his chance for stability and continuity and subjecting him to another failed placement with the parent." (*In re William B.* (2008) 163 Cal.App.4th 1220, 1229.)

We conclude that the court carefully evaluated the evidence, determined that mother had not carried her heightened burden of proof, and properly denied the section 388 petition.

<u>DISPOSITION</u>

The court's order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>HOLLENHORST</u>
J.

We concur:

<u>RAMIREZ</u>
P. J.

<u>CODRINGTON</u>
J.

23