Filed 8/25/16  V.R. v. Superior Court CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| V.R., et al.,<br><br>        Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU,<br><br>        Real Party in Interest. | A148472<br><br>(Contra Costa County<br>Super. Ct. No. J15-01178) |

Petitioners V.R. (Mother) and C.S. (Father), parents of S.R., seek review by extraordinary writ of the juvenile court's orders terminating reunification services and setting the matter for a permanency planning hearing, pursuant to Welfare and Institutions Code[1] section 366.26.  Mother and Father argue the juvenile court erred in finding jurisdiction was appropriate under section 300, subdivision (e).  They also challenge the juvenile court's decision to terminate reunification services and its refusal to place S.R. with a relative.  We shall deny the petition for extraordinary writ.

---

[1] All statutory references are to the Welfare and Institutions Code, unless otherwise specified.

# I. BACKGROUND

S.R. was born in August 2015. On November 5, 2015, when S.R. was around three months old, Mother brought him into the emergency room with a bruised hip. Mother told the doctors S.R. had rolled off the couch onto a guitar-type toy several hours earlier. According to Mother, S.R.'s legs seemed to bend oddly, but she did not find anything else of concern until later, when she noticed blood on the child's swing and a laceration on the back of his ear.

An X-ray indicated S.R.'s femur was fractured in two spots. The doctor thought the injury was inconsistent with Mother's explanation and possibly nonaccidental, and ordered a full-body X-ray. Further imaging showed multiple fractures of different ages, meaning there were old fractures that had healed over time.[2] Lab test results did not support a rickets diagnosis. S.R. was also observed to have an avulsion injury, which could only come from pulling " 'very hard' " on the ear. Additionally, S.R.'s liver enzymes were off, suggesting there had been a blunt injury or traumatic blow to S.R.'s abdomen. Bruises were observed on S.R.'s forehead and his left jaw line. Father said the bruises were the result of S.R. hitting and scratching himself, but the doctors dismissed this explanation as implausible.

Mother told the doctor she had just come out of maternity leave and returned to work on November 4 and 5. On those two days, Father had been with the child. Mother said prior to that she had been caring for S.R. " 'all day and all night,' " and no one else had been alone with the baby for more than five minutes. Mother and Father said that, other than falling off the couch, they could not remember S.R. sustaining any injuries since birth. The doctor explained S.R.'s injuries were most likely the result of violent injury, and Mother responded, " '[Y]ou don't know what the fuck you're talking about.

---

[2] Those injuries included subacute fractures at the right proximal and distal femur, metaphyseal corner fractures at the left distal femoral metaphysis, bucket-handle fracture at the left proximal tibia, metaphyseal corner fracture at the right proximal humerus, healing fracture at the left acromion, and suspected fractures at the left proximal and distal humeral metaphyses.

You need to do your fucking job. I did not hurt my baby. I am not a bad mother.' " Father tried to calm Mother.

Mother told a social worker she had left S.R. with Father's mother a few times, but she could not remember when. Nor could she remember the first time she left S.R. with someone else. When the social worker asked Mother about her earlier conversation with the doctor, Mother denied that she had told any hospital staff that S.R. was always in her care before she returned to work.

The social worker contacted S.Z., the mother of C., Father's other child. S.Z. said Father had been violent towards her and that is why their relationship ultimately ended. S.Z. asked the social worker if S.R. had bruising, explaining that when C. was an infant, she would occasionally find bruises on him. S.Z. confronted Father about the bruises, and he eventually admitted to pinching C. When the social worker asked Father about these statements, Father denied engaging in any domestic violence towards S.Z. and also denied pinching C.

On November 10, 2015, the Contra Costa County Children & Family Services Bureau (Bureau) filed a juvenile dependency petition pursuant to section 300, subdivision (e). The petition alleged S.R. was found to have sustained multiple skeletal fractures of differing ages that would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, while in Mother and Father's care. Two days later, the court detained S.R., finding there was a substantial danger to the physical health of the child or the child was suffering severe emotional damage. The court also ordered that S.R. not be placed with a relative.

A contested jurisdiction hearing commenced in January 2016. The court heard testimony from Detective Matthew Head, who investigated S.R.'s case. Head testified Father told him S.R. fell off the couch, and Mother was present during the incident. According to Head, Father could not provide an explanation of how S.R. sustained multiple fractures, and said the bruises to S.R.'s face were self-inflicted. Head further testified Mother's initial account of S.R.'s injury was the same as Father's — she was home at time of the purported couch incident. Mother later admitted to Head she was not

3

home when S.R. fell off the couch. She claimed Father asked her to lie because he was afraid he would be arrested. Head also spoke with a friend of Mother's who showed him text messages in which the friend said she hoped Mother and Father told the police the same thing, and Mother responded: "Yeah, I'm sure we will. He's heard me say it lots already to all the doctors."

Dr. James Crawford-Jakubiak (hereafter Crawford) testified as an expert in pediatrics and medical evaluation and diagnosis of child abuse and neglect. He stated S.R. had multiple fractures to the femur — "The bone was broken both towards the hip side as well as towards the knee side." S.R. also had multiple fractures to the tibia and humerus. It appeared S.R. had sustained a fracture to his acromion, which is part of the shoulder blade that touches the collarbone. According to Crawford, the injuries were sustained on at least two different days, and the first injury occurred a week or two before the X-rays were taken. S.R. also had an avulsion injury, meaning the ear had been partially pulled from the head resulting in a tissue tear. Crawford said of S.R.'s injuries: "[T]here's no disease that can do this to a baby. This is a baby who sustained trauma." Crawford testified a fall from a couch[3] might have aggravated one of S.R.'s previous injuries, but the fall did not explain his other injuries, including the avulsion. Crawford stated S.R.'s injuries were not caused by rickets or osteogenesis imperfecta (OI). Crawford concluded S.R.'s injuries "don't have a clear explanation other than child abuse."

When asked about whether she believed Dr. Crawford's conclusion, Mother testified: "I don't know. Because I've never seen any physical abuse. I can't say if I wasn't there." Mother denied hitting or pushing S.R. She did not have any explanation as to how S.R. sustained multiple fractures at different stages of healing. She said she never witnessed Father hurting S.R. and did not have any reason to believe Father would

---

[3] A few days before the alleged couch incident, blood was found in S.R.'s vomit. Crawford expressed concern S.R. was not brought into the hospital at that time, especially since S.R. had previously been discharged from the hospital with instructions that he should be brought back upon discovery of such symptoms.

hurt him. Mother admitted to lying to the doctors about being present when S.R. fell off the couch, stating Father had told her the hospital would take the baby away if it was revealed S.R. had only been with one parent. She also denied telling any doctor S.R. had not been left alone with anyone else for more than five minutes.

After hearing the evidence, the juvenile court stated: "[M]other's lies are deep and extensive. The detail to which she lied and fabricated, . . . how does one sort out reality versus lies that Mother provided. Quite frankly these injuries could have occurred the night before, the early morning hours before Mother left for work, when Mother states she got home from work. We really don't know. [¶] And her statements that these occurred while she was at work, I give little credence to, because I do not find her credible at all. [¶] And it certainly doesn't explain ten fractures in a three-month infant at the time. These occurred over a course of time in different stages of healing. And a lot of focus has been placed on the quote-unquote incident. But there were many incidents. [¶] And we have credible testimony from Dr. Crawford with respect to the sort of pain this infant was in when he suffered these various fractures to his body. [¶] And this notion that there is a genetic disorder that could explain this, there's no evidence, first of all that he has this genetic disorder. And Dr. Crawford . . . stated no disease could do this to a baby. That no medical diagnosis, whether it's OI or something else, can cause this form of trauma."

The juvenile court sustained the petition on March 1, 2016. As amended by the juvenile court, the sustained petition states in relevant part: "On or about November 5th of 2015 the child was found to have sustained multiple skeletal fractures of differing ages that would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent while in Mother and Father's care . . . ." The juvenile court also sustained the amended allegations that "on or about November 5, 2015, the child presented to the emergency room . . . with high liver enzymes, indicative of blunt trauma to the child's abdomen, and was found to have suffered several serious and unexplained physical injuries while in the care and custody of his mother and father, including an avulsion injury to his ear, as well as bruising on both his forehead and jaw

5

line." The juvenile court dismissed the duplicative allegations in the petition that mentioned Father alone, as the sustained allegations had been amended to include Father.

The Bureau prepared a report for the disposition hearing set for March 30, 2016, recommending reunification services be terminated. The report stated the social worker was unable to speak with Father or Mother by phone or arrange an in-person meeting to discuss their goals, despite leaving several voicemails and e-mails. Mother indicated by e-mail that she was taking parenting and anger management classes. Mother also e-mailed the social worker stating she wished she had been given " 'the opportunity to fully eliminate all genetic, medical conditions that could have caused [S.R.]'s injuries.' " Mother added she knew for a fact that neither she nor Father hurt S.R. Father also told the social worker neither he nor Mother caused S.R.'s injuries, stating S.R. was a " 'fragile baby with many medical issues.' " As to the parents' visits with S.R., the social worker stated: "In this social worker's sixteen years at the Bureau, with countless other cases of severe physical abuse, this social worker has never seen a child have a more adverse reaction to a visit than [S.R.] initially had in this case." The social worker concluded that providing reunification services would not be in the child's best interest, explaining: "The parents have been avoiding face-to-face contact with the social worker to discuss their son's injuries and the role that they have played in his injuries. The parents have not demonstrated any insight regarding the abuse nor an ability to benefit from services."

The Bureau also recommended against placing S.R. with Mother's or Father's family members: "[T]he Bureau does not feel that those that have had their home environments approved, would provide for the continued safety and protection of the child. Not a single family member that has applied for placement and spoke with the undersigned social worker has demonstrated an understanding that the injuries that this child sustained were non-accidental. Not one family member appears to believe the medical evidence that [S.R.] was undeniably physically abused on more than one occasion. Furthermore, several of the family members, including the paternal grandmother, . . . were providing care for the child during the time that the child

6

sustained the multiple injuries. Accordingly, there is absolutely no way that any of the family members that have applied could keep this vulnerable seven-month-old child safe."

At the disposition hearing, the court heard testimony from Mother, various members of Mother's and Father's family, the social worker who prepared the disposition report, and S.R.'s foster Mother. Father did not testify. When Mother was asked whether she thought S.R. had been abused, she responded: ". . . I feel like if that's what the doctors and the judge and the Court and everybody says, I mean, then that's what happened. [¶] I can't go back and see if anyone did it because I wasn't there. But that's what everyone is saying, then — and I'm going to have to accept it in the end, you know. But I personally did not nor would I ever do anything to my son to hurt him." Mother maintained the bruising on S.R.'s face was self-inflicted.

The court followed the Bureau's recommendation and denied reunification services pursuant to section 361.5, subdivision (b)(5) and (6). The court found Mother's testimony was not credible, finding she "has continued to perpetrate . . . material misstatements, not only in her reports to the doctors initially, subsequently to law enforcement, but also in her testimony before this Court." The court also stated the evidence suggested reunification would not be in the best interest of the child, stating: "This child was physically abused and he was physically abused in the home while directly in the care and custody of mother and father, period. And the fact that the parents are showing up at meetings and parenting programs does not amount to clear and convincing evidence that reunification is in the best interest of the child. I believe this child would be at risk of further injury and quite frankly possible death if returned to the parents who inflict this type of physical harm on a 2- or 3-month old infant child."

The court then heard testimony from relatives in support of their requests for placement of S.R. in their care. The court denied placement with these relatives, stating: "I believe placement with any of these relatives who testified here today is not only not in the best interest of the child but I think it goes beyond that. I think it could be very harmful, both physically placing the child at physical risk of harm by providing the

7

parents access, and emotional harm, as this child is completely distressed when he sees his parents."

A section 366.26 hearing to consider termination of parental rights was set for September 7, 2016.

## II. DISCUSSION

### A. *Jurisdiction*

The juvenile court found jurisdiction was appropriate under section 300, subdivision (e), which allows for jurisdiction where "[t]he child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child."

As an initial matter, Mother contends the allegations of the amended petition sustained by the juvenile court do not support the exercise of jurisdiction under section 300, subdivision (e). Mother argues the statute requires a finding the child suffered severe physical abuse by a parent or a person known by the parent, yet the petition fails to state any particular person caused the injuries to S.R. Because Mother did not challenge the factual sufficiency of the petition below, she has forfeited her right to raise the issue now. (See *In re James C.* (2002) 104 Cal.App.4th 470, 480–481.)

In any event, because we conclude substantial evidence supports the exercise of jurisdiction under section 300, subdivision (e), any factual deficiencies with respect to the specificity of the allegations in the juvenile dependency petition constitute harmless error. (See *In re Athena P.* (2002) 103 Cal.App.4th 617, 628 ["If the evidence at the jurisdictional hearing was insufficient, Kimberly can seek reversal on that ground. But if the evidence was sufficient to support the juvenile court's findings, any failure of the petition to state a cause of action became harmless error."].) "Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.) On appellate review, we do not reweigh the evidence or second-guess the juvenile court's credibility determinations. (*Ibid.*)

8

Mother contends the evidence supports a finding that someone else abused S.R., since other family members regularly cared for the child and she was not at home at the time of the "incident." The argument is meritless. There is more than ample evidence to support a finding Mother committed the abuse or knew about it. Mother initially told doctors she had been caring for S.R. all day and night until she returned to work a day before he was brought to the hospital. The evidence indicates S.R. suffered one or more violent injuries during the period when he was always with Mother. Mother also initially claimed she was present when S.R. purportedly fell off the couch. Mother later tried to walk back these statements, claiming she sometimes left S.R. with relatives, and she was not home when S.R. fell off the couch. But the juvenile court did not find these statements credible, and we cannot second-guess such determinations. In any event, given the inconsistencies in Mother's account, her admission that she lied, and the serious and violent injuries sustained by S.R. while under her care, the juvenile court had every reason to be skeptical of Mother's account. And even if S.R. did fall off a couch and Mother was not home for that incident, the evidence indicates such a fall does not explain all of S.R.'s injuries.

Mother also contends that if she were the perpetrator, she would not have taken S.R. to the hospital or allowed him to be X-rayed, for fear her abuse would be discovered. But that is not the only inference that can be drawn from these facts. Indeed, other inferences are far more plausible. For example, the juvenile court could have reasonably inferred Mother abused S.R. but believed the doctors would not suspect his injuries were caused by abuse. Alternatively, the juvenile court could have inferred Mother was willing to risk detection because of the need for medical treatment.

Father argues there was a lack of substantial evidence because expert medical testimony was provided showing S.R.'s injuries were likely caused by OI, a genetic bone disorder. The contention is disingenuous at best. Dr. Crawford ruled out OI as an explanation for S.R.'s injuries, and we cannot conclude the juvenile court erred in relying on his testimony. Dr. Kristin Livingston, upon whose testimony Father appears to rely, stated she could not make a definitive determination as to whether or not S.R. had OI.

She also testified OI was rare and, other than having multiple fractures, S.R. did not exhibit the obvious hallmarks of the disease. Further, Livingston stated S.R.'s avulsion and elevated liver enzymes could not be explained by OI.

We also reject the suggestion that section 300, subdivision (e) was inapplicable because the perpetrator of the abuse was never identified. "[W]here there is no identifiable perpetrator, only a cast of suspects, jurisdiction under subdivision (e) is not automatically ruled out. A finding may be supported by circumstantial evidence . . . . Otherwise, a family could stonewall . . . concerning the origin of a child's injuries and escape a jurisdictional finding under subdivision (e)." (*In re E.H.* (2003) 108 Cal.App.4th 659, 670.) Here, the circumstantial evidence was overwhelming. As discussed, Mother initially claimed she was always with S.R. during the relevant period, and that no one else looked after him for more than five minutes. Contrary to Mother's contentions, the juvenile court did not need to speculate about whether Mother was aware of the abuse. It merely needed to look to her own admissions. Likewise, there was ample circumstantial evidence to support an inference Father abused S.R. He does not dispute he was home when S.R. sustained the injury that caused his parents to bring him to the hospital. Moreover, there is evidence Father was violent with his other son.

**B. *Reunification Services***

The juvenile court denied reunification services pursuant to section 361.5, subdivision (b)(5) and (6). Mother and Father argue this was error. We disagree.

Pursuant to section 361.5, subdivision (b)(5), reunification services need not be provided to a parent or guardian when the juvenile court finds, by clear and convincing evidence, "[t]hat the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent or guardian." Subdivision (b)(6) of section 361.5 permits a court to deny reunification services where "the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of . . . the infliction of severe physical harm to the child . . . by a parent or guardian, . . . and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian." The juvenile court

10

shall not order reunification where subdivision (b)(5) and (6) apply "unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c), 2d par.) Additionally, the court shall not order reunification services in any situation described in subdivision (b)(5) "unless it finds that, based on competent testimony, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." (§ 361.5, subd. (c), 3d par.)

As discussed above, there is ample evidence to support a finding S.R. was brought within the jurisdiction of the juvenile court under section 300, subdivision (e). As such, reunification services were properly denied under section 361.5, subdivision (b)(5). We also conclude denial of reunification services was appropriate under subdivision (b)(6), but in light of the clear applicability of subdivision (b)(5), we need not dwell on the issue.

Mother and Father argue the court erred because there was sufficient evidence to support a finding services were likely to be successful and prevent further abuse. They appear to misconstrue the legal standard. As their own authority states, once the Bureau established by clear and convincing evidence that S.R. fell under section 300, subdivision (e), "the general rule favoring reunification services no longer applies; it is replaced by a legislative assumption that offering services would be an unwise use of governmental resources. If the court then chooses to offer services, it must make a finding that they are likely to prevent reabuse of the child, and this finding must be supported by substantial evidence. While [the Bureau] has the statutory duty to investigate and present the court with information about the prognosis for a successful reunification, it is not required to prove the services will be unsuccessful." (*Raymond C. v. Superior Court* (1997) 55 Cal.App.4th 159, 164.)

In any event, there was ample evidence to support a finding reunification services were unlikely to be successful. First and foremost, Mother and Father continued to refuse to acknowledge any abuse had occurred, despite the overwhelming evidence to the contrary. Father told the social worker neither he nor Mother caused S.R.'s injuries, insisting S.R. was merely a " 'fragile baby.' " Likewise, Mother told the social worker

11

she knew "for a fact" she and Father did not abuse S.R. At the dispositional hearing, Mother suggested she could not be sure Father abused S.R. "because I wasn't there," and then continued to insist the bruising on S.R.'s face was self-inflicted. "[T]here are no services that will prevent reabuse by a parent who refuses to acknowledge the abuse in the first place." (*In re A.M.* (2013) 217 Cal.App.4th 1067, 1077.) Moreover, there was other evidence reunification services would be unsuccessful. As the Bureau explained in its report, Mother and Father avoided face-to-face contact with the social worker, they failed to demonstrate any insight regarding their ability to benefit from services, and S.R. had an extremely adverse reaction to their visits.

## C. *Relative Placement*

Finally, Mother and Father challenge the juvenile court's decision not to place S.R. with a relative. We conclude the juvenile court acted within its discretion. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 320 [abuse of discretion standard applies in this context].)

Pursuant to section 361.3, "preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative." (§ 361.3, subd. (a).) In determining whether a child should be placed with a relative, the court shall consider all of the following factors: (1) the best interest of the child; (2) the wishes of the parent, the relative, and child; (3) provisions of the Family Code regarding relative placement; (4) placement of siblings in the same home; (5) the moral character of the relative and any other adult living in the home; (6) the nature and duration of the relationship between the child and the relative; (7) the ability of the relative to provide a safe, secure, and stable environment, exercise proper and effective care of the child, provide the child with a home and the necessities of life, protect the child from his or her parents, facilitate court orders and all elements of the case plan, and provide legal permanence for the child if reunification fails. (§ 361.3, subd. (a)(1)–(7).)

Here, the juvenile court heard testimony from several family members who requested S.R. be placed in their care. The court found placement with all of these relatives would be inappropriate. As to S.R.'s paternal great-grandmother, the court

12

found she did not have an extensive relationship with S.R. and, given her age, she did not appear to be able to provide a secure and stable environment. The court also worried she would be unable to keep the child safe from his parents. The court also rejected S.R.'s paternal grandmother as an appropriate placement, stating it was concerned about her emotional stability given the nature and quality of her testimony. The court was also concerned S.R. may have sustained his injuries while in her care, and her opinions concerning the cause of S.R.'s injuries were "alarming." S.R.'s paternal great-aunt was not a relative who was entitled to preferential treatment, and the court found her request appeared to be driven solely by an effort to support Father. The court was also concerned she would not keep S.R. safe from his parents. The court shared similar concerns about a second paternal great-aunt. The court concluded placing S.R. with any of the relatives who had come forward could potentially be physically harmful to S.R.

Neither Mother nor Father seriously challenge the juvenile court's findings. Mother argues the court erred because it failed to consider each of the placement factors described in section 361.3, subdivision (a) for each of the relatives who came forward. But the court was not required to document its findings on each factor, and Mother points to nothing in the record indicating there was something the juvenile court missed. Both Mother and Father assert the Bureau assessed and approved the homes of the paternal grandmother and a paternal great-aunt for placement. But that determination was not dispositive or especially meaningful since the juvenile court concluded placing S.R. with these relatives posed a potential physical danger to S.R.'s health and safety.

## III. DISPOSITION

The petitions for an extraordinary writ are denied on the merits. The decision is final in this court immediately. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

13

_____
Margulies, J.

We concur:


_____
Humes, P.J.


_____
Banke, J.




A148472