Filed 8/17/22

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re RAUL V., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E077964 |
| Plaintiff and Respondent, | (Super.Ct.No. J289408) |
| v. | OPINION |
| S.Z., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Erin K. Alexander, Judge. Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

1

The juvenile court bypassed family reunification services for appellant S.Z. (Mother) on the basis of subdivisions (b)(5) and (c)(3) of Welfare and Institutions Code section 361.5 (unlabeled statutory citations refer to this code). Mother contends that the court's ruling is not supported by substantial evidence. We conclude that Mother's argument lacks merit.

We publish this opinion in order to clarify the relationship between subdivisions (b)(5) and (c)(3) of section 361.5 and the resulting burden on an appellant challenging the bypass of reunification services under those provisions. Once the juvenile court finds by clear and convincing evidence that subdivision (b)(5) of section 361.5 applies, subdivision (c)(3) makes bypass mandatory unless the juvenile court finds that providing reunification services to the parent in question is "likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." (§ 361.5, subd. (c)(3).)

If the juvenile court declines to make the finding under subdivision (c)(3) of section 361.5 and consequently bypasses services for the parent, and the parent argues on appeal that services *are* likely to prevent reabuse or continued neglect, then the parent's argument is not a challenge to the sufficiency of the evidence. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528 (*I.W.*), disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) That is, the parent is not arguing that a finding made by the trial court is not supported by substantial evidence. Rather, the parent is

2

arguing that the juvenile court erred by failing to make the finding under subdivision (c)(3) of section 361.5, so the parent must show that "the evidence compels a finding in favor of the appellant as a matter of law." (*I.W.*, at p. 1528.) Because Mother has not made that showing and cannot do so on this record, we affirm.

BACKGROUND

A. *Referral and Investigation*

On the evening of June 2, 2021, Mother brought three-month-old Raul to the hospital emergency room because of swelling in his upper left arm. The child was found to have an acute fracture of that arm as well as an older fracture of the left femur that had started to heal. He also had marks on his upper left thigh that appeared to have been caused by adult fingernails, and he was missing the frenulum under his tongue. San Bernardino County Children and Family Services (CFS) received a referral alleging physical abuse of Raul and dispatched the after-hours social worker to the hospital, where she interviewed the physician's assistant (PA), the nurse, police officers who had consulted with the examining physician, Mother, and R.M. (Father).

The referral noted that Mother appeared suspicious when the reporting party was asking her questions. The nurse reported that Mother's behavior with her son was "'not really appropriate,'" she left him alone on the bed, and the nurse had to care for him and give him his bottle. The PA reported that Mother expressed interest in the child's tongue, stating that an aunt or great-aunt had cleaned "'bugs'" off his tongue, but she denied placing anything in his mouth or using anything to clean his tongue. The PA also noted

3

that Raul had been born premature and that there were nursing concerns at that time regarding Mother's apparent lack of comprehension and maternal engagement. The doctor, the PA, and the nurse all reported that Mother denied knowing how the child had been injured. When interviewed by the social worker, Mother stated that Raul's arm was fine when they visited maternal grandmother earlier in the day. When asked about the fingernail marks on the child's thigh, Mother said she noticed them after she woke up, and she "suggested a neighborhood kid could have done it." The social worker noted Mother's affect appeared to be somewhat flat, and she did not appear upset about the boy's fractures. Mother denied any domestic violence, mental health issues, or drug use.

Father denied knowing how the child was injured and stated that Raul's arm was fine that morning when Father left for work, but he noticed the swelling after returning home around 6:00 p.m. Although Mother said the baby's arm was "'not that swollen,'" Father was concerned that the child had strength in the right arm but none in the left, and Father suggested they take him to the hospital to be checked. Father denied ever seeing Mother being aggressive with the child. He said she "'acts normal'" when he is around and "'appears angry'" when others are around, but he could not provide details. Father denied any domestic violence, drug or alcohol use, or mental health concerns with him or Mother.

The social worker, accompanied by police officers, visited maternal grandmother, who reported that Mother had arrived with Raul around 1:00 p.m., took a nap, and left around 4:00 p.m. According to maternal grandmother, the child seemed fine and only

4

fussed when he got hungry. She said she received a text with a picture of the child's swollen arm around 6:00 p.m., but when police looked through her phone, they were unable to find the picture and said it appeared she had deleted some text messages and phone calls. She said she had observed the marks on Raul's leg on June 1, 2021, and asked Mother about them, and Mother said she did not know. Maternal grandmother stated that Mother had no history of mental illness, drug use, or domestic violence. She said that Mother treats Raul "'normal'" when he cries. She reported that Mother also has a four-year-old son by another father, they are vacationing in Nicaragua, and Mother uses only verbal discipline with him, nothing physical.[1]

The social worker also visited Raul's home and spoke with Father's adult son, A.V., who was residing there with Father, Mother, and the child. A.V. denied any domestic violence or drug use in the home, and he reported that he had never seen anyone hit Raul. He stated that Mother "'is not all there,'" but he gave no specifics except that sometimes Mother fails to respond when the child cries and just continues doing whatever she was doing. He said that he was at work during the day when the injury occurred.

CFS obtained a detention warrant, served Mother and Father at the hospital, and took the child into custody without incident on the evening of June 3, 2021. The following day, the social worker spoke with the physician at the Children's Assessment

---

[1] Mother's older son was originally included in the dependency proceedings but was dismissed for lack of jurisdiction after the evidence established that he was born in Nicaragua, had been residing there with his father since January 2020, and had no expected date of return to California.

5

Center, who reported that Raul had been physically abused. The child had healthy bones and no bone disorder that would cause the fractures. The femur fracture appeared to have been caused by a bend or twist approximately a week earlier and was already healing, so no bandaging or casting was needed. The arm fracture required bandaging the arm close to the body but should heal nicely. The missing tongue frenulum appeared "'strange,'" but if it was caused by an injury, it was not acute.

On June 5, 2021, the social worker spoke to Mother by phone. During the call, Mother blurted out, in English, "'I know I need help. I didn't do it on purpose. I'm very . . . I did it.'" Mother then expressed difficulty explaining in English, and a certified bilingual social service assistant joined the call to act as an interpreter. Mother explained that on Sunday, May 30, 2021, she was changing Raul's diaper on the bed at home, Raul was crying, and Mother pinched his leg. She admitted the marks on Raul's thigh were from her fingernails, but she denied twisting, bending, or squeezing his leg. Mother stated it was the first time anything like this had happened, saying, "'I don't know what came over me. I need help.'" She said Father was not home during the incident. She did not tell him what happened, because she did not want him to get upset.

Regarding the injury to Raul's arm on June 2, 2021, Mother said that she did not know how it occurred. She said that he did not fall or hurt his arm, was behaving normally all day, and was not crying, but after she bathed him and laid him on the bed, she thought it was strange that he was crying. She noticed that his arm was swollen that evening around 6:00 p.m., but she did not tell Father or maternal grandmother because

6

she did not want them to be "'mad'" at her. She said the injury "'might have happened when I was changing his clothes or putting him in the car seat,'" and "'[i]f it was me, I hid it from the dad.'" After Father came home from work, he saw the swollen arm and texted a picture of it to maternal grandmother, and they took the child to the emergency room. Mother said that she did not tell the truth when questioned by law enforcement because she was scared of being arrested and going to jail.

After Mother told Father the truth about pinching Raul's leg, Father "'got mad,'" they separated, and Mother was staying with maternal grandmother. Mother said that she believes she suffers from anxiety and that she stopped taking medication for anxiety roughly six months earlier. She had not seen a doctor since then because of the pandemic and the birth of Raul, but she said that she would be willing to speak with a counselor or a psychologist for help.

B.    *Detention*

CFS filed a section 300 petition alleging serious physical harm under subdivision (a), failure to protect under subdivision (b)(1), and severe physical abuse under subdivision (e). The petition alleged that Mother physically abused the child, Father knew or reasonably should have known of the abuse and failed to protect the child, Mother has untreated mental illness impairing her ability to care for the child, and Mother's physical abuse of the child was severe in that it caused bone fractures on more than one occasion.

7

Both parents were present at the detention hearing. The court detained Raul, advised the parents that the bypass provisions of subdivision (b) of section 361.5 might apply, and ordered predisposition services for both parents.

C.  *Jurisdiction*

CFS's jurisdiction/disposition report contained the following additional information. Mother was interviewed again and reiterated that Raul was fine throughout the day on June 2, 2021. Only after Father returned home from work and Mother took the baby out of his swing around 6:30 or 7:00 p.m. did she notice that his arm was swollen and he could not move it, although he could move his fingers. They then took him to the emergency room. Mother said that she was told at the hospital that Raul's arm was dislocated. She said, "'I don't know how it happened. I didn't do it.'" She acknowledged the injury could have occurred while the child was in her care, but "'it would have been an accident.'" She said, "'Maybe it happened when I was showering or changing him. I can't be sure it was from me, but if it was, it was not on purpose. I love my son very much.'" She admitted that she had pinched the child's leg on May 30, 2021, after becoming frustrated that he would not stop crying, stating, "'I don't know what happened to me in that moment,'" and she then hid the injury from Father. She denied doing anything that would have caused the leg fracture, and she denied knowing how the child injured his arm or why his frenulum was missing. She stated, "'I never did anything to my son. I only pinched him.'" She also stated that Father would never hurt the child.

8

Regarding her mental health, Mother stated that she had made appointments to see a therapist and a psychiatrist. She felt that she might be suffering from postpartum depression because after the birth of her first child in 2017, she felt sad and isolated and had seen a therapist and been prescribed medication, which was helpful. She denied ever harming or wanting to harm her first child.

Father was interviewed the same day and denied knowing how Raul's injuries occurred or doing anything that could have harmed the child. He said he believed the injuries must have been caused by Mother, but he denied any knowledge of her mental health issues and denied ever seeing her hurt the baby. He stated that he told the police during his June 3, 2021, interview that he did not believe Mother would have done anything to hurt the child. But Mother subsequently confessed to him that she had pinched the baby, and he now believes she did something to cause the child's other injuries. After Mother confessed, Father asked her to leave the home.

The report recommended bypassing family reunification services for both parents under subdivision (b)(5) of section 361.5 because Raul was a child under age five who had suffered severe physical abuse. The child's injuries—including fingernail marks on his left leg and fractures of the left leg and left arm that occurred on different occasions—had all occurred while in the care and custody of Mother, who could not provide an explanation for the injuries, and Father knew or should have known Mother was abusing the child but failed to take steps to protect him from Mother's abuse. The report noted that both parents had received referrals for individual therapy, parenting

9

education, and anger management classes, and both parents expressed a desire to cooperate. Mother had moved out of Father's home and had admitted pinching the child's leg, but Mother denied causing the child's other injuries, for which neither parent had provided an explanation. The report stated that so long as the parents continued to deny the abuse, the family's prognosis for reunification remained guarded, but the report also noted that CFS's recommendation against reunification services was subject to additional or differing information that might be acquired during further investigation.

The juvenile court granted the parents' request to bifurcate the proceedings and set the contested jurisdiction and disposition hearings for separate dates. For the jurisdiction hearing, CFS reported that Mother was enrolled in parenting classes and had completed a psychiatric evaluation, where she was diagnosed with adjustment disorder and prescribed an antidepressant medication. In addition, CFS reported that Raul had a follow-up visit with the forensic pediatrician, who noted that the child still had visible scars on his thigh from Mother's fingernails. The pediatrician stated that when the child was brought to the hospital in June 2021, the arm fracture, which was caused by a violent bend or twist, was acute with considerable swelling and no signs of healing, indicating the injury must have occurred within a few days, whereas the leg fracture, which could have been caused by a twist and may have happened at the same time as the fingernail marks, was at least a week old and the child's caregiver would have noticed the child being fussy and crying because of the pain in his leg.

At the contested jurisdiction hearing, the juvenile court received an additional report that Mother had been participating in weekly individual therapy sessions for two months. The court found true the allegations that Mother physically abused Raul under section 300, subdivisions (a) and (b), that Mother suffers from mental illness impairing her ability to care for Raul and that Father knew or should have known of Mother's physical abuse under section 300, subdivision (b), and the court found by clear and convincing evidence that Mother perpetrated severe physical abuse on Raul under section 300, subdivision (e).

D.    *Disposition*

For the pretrial settlement conference, CFS reported that both parents had completed individual therapy. The therapist said, "he is worried about [M]other's mental status." He further reported that Mother "acknowledges what she did was wrong but does not remember what happened." The report also noted that on two separate visits with Mother, after the social worker had informed her that the child had already been fed before the visit and would not be hungry, Mother proceeded to bottle feed him, which caused him to choke and throw up. On one occasion, Mother was holding the child with his arm in an awkward position and had to be advised by the social worker to pay attention to his arm.

For the contested disposition hearing, CFS reported on Mother's updated progress with therapy, anger management, parenting education, and psychiatric care. The report

11

stated that Mother again acknowledged having pinched the child's leg but continued to deny any knowledge of how the other injuries occurred.

Mother retained Sara M. Hough, Psy.D., who performed a forensic psychological evaluation of Mother and submitted a report, which the juvenile court admitted into evidence at the disposition hearing, along with Hough's C.V. Hough's report states that Mother acknowledged that "'[s]omething happened'" resulting in her son's injuries. She admitted scratching and pinching his leg and that the arm fracture may have occurred when she was moving him or incorrectly carrying him. The report states that Mother does not deny the injuries occurred, but she has "challenges recalling the details." Hough indicated that "it is likely that mother was suffering from some form of mental illness . . . which contributed to her inability to properly care for minor," and she noted that "[i]t is not uncommon for individuals suffering from depression or another mental illness to not recall all the details that may have contributed to a specific behavior." Hough opined that Mother's inability to recall the details of the injuries "does not stem from cognitive challenges nor is she volitionally denying or not taking responsibility for the action." Hough's report indicates that "Mother has taken responsibility for actions that has [*sic*] resulted in minor's injury" in that she "acknowledge[d] that it happened in her care and that her behaviors contributed to child's injury." Hough recommended that CFS should remain involved with the family for at least 18 months to ensure Mother's compliance with treatment, including individual therapy and medication, and that

12

Mother's treating professionals should opine after 18 months on the need to continue services.

At the disposition hearing, Hough testified that Mother acknowledged and took responsibility that her son's injuries occurred in her care. Hough testified that it was "not uncommon for individuals suffering from depression and anxiety to have some memory gaps," and Mother's inability to recall the details did not indicate a failure to take responsibility.

When asked whether services were likely to prevent reabuse or continued neglect, Hough responded that "[n]othing can be within 100 percent assurity" but Mother's risk factors are "significantly lower" with ongoing intervention. When questioned by county counsel, Hough acknowledged it was possible that Mother could be intentionally withholding information as to how the child's arm and leg were fractured. Hough also acknowledged the possibility that Mother was not suffering from an untreated mental illness at the time the child was injured.

After hearing argument, the juvenile court removed Raul from parental custody and ordered reunification services for Father but bypassed reunification services for Mother pursuant to section 361.5, subdivision (b)(5). The court expressed concern that the child was only three months old and had suffered two fractures occurring on different occasions, as well as the fingernail marks that were still visible months later. While the court agreed that Mother had some mental health issues that contributed to her behavior, it could not agree with Hough's conclusion that Mother's mental health issues explain her

13

"failure to fully explain what happened to this child and take full accountability for that."

The court noted that Mother was aware from her first pregnancy of her propensity to suffer post-partum depression but took no action to get medication or other treatment that might have prevented the injuries to her second child. The court also noted that even accepting Hough's views, it would take at least 18 months of services to ensure Mother's compliance before reunification would be possible, which is far beyond the statutory time frame for a child under the age of three. The court concluded that Mother had failed to demonstrate that services were likely to prevent reabuse or continued neglect, and the court accordingly denied reunification services to Mother.

## DISCUSSION

"Reunification services must be provided to the mother and statutorily presumed father of children who have been removed from their parents' custody, unless a statutory exception applies. [Citations.] The statutory exceptions are contained in subdivision (b) of section 361.5, which provides that '[r]eunification services need not be provided' if the court finds 'by clear and convincing evidence' that any of 17 enumerated bypass provisions apply." (*In re A.E.* (2019) 38 Cal.App.5th 1124, 1141 (*A.E.*).) Section 361.5, subdivision (b)(5), provides that reunification services need not be provided to a parent if the court finds by clear and convincing evidence that the child was brought within the jurisdiction of the court under subdivision (e) of section 300 (severe physical abuse of a child under age five) because of the conduct of that parent. (§ 361.5, subd. (b)(5).)

14

Mother does not challenge the juvenile court's jurisdictional findings, including the finding by clear and convincing evidence that the petition's allegations under subdivision (e) of section 300 are true.  Consequently, Mother also does not challenge the juvenile court's finding by clear and convincing evidence that subdivision (b)(5) of section 361.5 applies to her.  Instead, Mother argues that the juvenile court erred by denying her services under subdivision (c)(3) of section 361.5, which provides that "the court shall not order reunification in any situation described in paragraph (5) of subdivision (b) unless it finds that, based on competent evidence, those services are likely to prevent reabuse or continued neglect of the child."[2]  (§ 361.5, subd. (c)(3).)  Once the juvenile court determines that the bypass provision of subdivision (b)(5) of section 361.5 applies, the burden shifts to the parent to show that services are likely to prevent reabuse. (*A.E.*, *supra*, 38 Cal.App.5th at p. 1148; *Raymond C. v. Superior Court* (1997) 55 Cal.App.4th 159, 163-164.)

The juvenile court determined that Mother failed to carry her burden of proving by a preponderance of the evidence that services are likely to prevent reabuse.  That is the ruling that Mother challenges on appeal.  Thus, Mother is not challenging the sufficiency of the evidence to support a finding that the juvenile court made or was required to make

---

[2]  The statute also allows services to be provided if the court finds "that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent."  (§ 361.5, subd. (c)(3).)  Mother does not argue that the record contains evidence of a close and positive attachment between her and Raul that would support a finding that bypass would be detrimental.

in order to bypass her. Rather, Mother is challenging the juvenile court's failure to make a finding that would have been required in order *not* to bypass her.

Although Mother frames the issue as a challenge to the sufficiency of the evidence to support the juvenile court's findings, "it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment." (*I.W.*, *supra*, 180 Cal.App.4th at p. 1528.) Rather, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law," that is, whether the evidence supporting Mother's position "was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*Ibid.*; accord *In re R.V.* (2015) 61 Cal.4th 181, 203.)

Because Mother mischaracterizes her argument as showing that "the juvenile court's findings were not supported by substantial evidence" (boldface and capitalization omitted), she does not attempt to make the required showing that the evidence compels a finding in her favor as a matter of law. Nor could she make such a showing on this record.

The evidence supporting Mother's position was not uncontradicted and unimpeached and was not of such a character and weight as to compel a finding in her favor. Mother relies on Hough's testimony, but the court was not required to credit Hough's testimony, even if it was uncontradicted. (*Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486-1487.) Moreover, the

16

juvenile court had good reasons for rejecting important parts of that testimony. For example, Hough attributed Mother's purported inability to recall the details of how the injuries occurred to memory impairment resulting from Mother's mental illness, but the juvenile court found Hough's account inconsistent with Mother's denials and varying explanations over time.

Mother also relies on evidence that she participated in predisposition services, but that evidence too did not require the juvenile court to find in her favor. The only explanation that Mother has ever given for the bone fractures—that perhaps they occurred when she was moving Raul or carrying him incorrectly—conflicted with the medical evidence, which showed that the fractures were caused by violent twisting or bending and were consistent with physical abuse. And as already noted, the juvenile court reasonably did not believe Mother's claim that she could not remember anything else about how the injuries were caused. The evidence thus supported a reasonable inference that by the time of the disposition hearing Mother still had not admitted and hence had not begun to address what she had done to Raul. Given Mother's medically unsupported explanation of the fractures and the court's well-supported rejection of her claims of memory loss, the court was not required to believe that the predisposition services had accomplished anything, let alone that further services would be more successful. (See *A.E.*, *supra*, 38 Cal.App.5th at pp. 1143-1144; *In re A.M.* (2013) 217 Cal.App.4th 1067, 1078.)

For all of these reasons, "[t]his is simply not a case where undisputed facts lead to only one conclusion" in Mother's favor. (*I.W.*, *supra*, 180 Cal.App.4th at p. 1529.) We accordingly reject Mother's argument that the juvenile court erred by determining that Mother failed to carry her burden of proving that services would be likely to prevent reabuse.

We also find no merit to Mother's contention that CFS failed to meet its obligations to investigate the circumstances leading to the child's removal and advise the court on the prospects for reunification. (§ 361.5, subd. (c)(3).) CFS conducted multiple interviews of both parents, maternal grandmother, Father's grown son who resided with the family, law enforcement and medical personnel who observed Mother's demeanor and interactions with Raul at the hospital, and the forensic pediatrician who examined the child. On the basis of that extensive investigation, CFS recommended against reunification services for Mother, noting that "[t]he prognosis for reunification for the family is guarded" in light of the parents' denial of physical abuse and failure to explain the child's injuries. We accordingly conclude that CFS met its statutory obligation to investigate the circumstances leading to Raul's removal and advise the court concerning the prospects for reunification.

18

DISPOSITION

The judgment is affirmed.

**CERTIFIED FOR PUBLICATION**

MENETREZ _____

J.

We concur:


McKINSTER _____

        Acting P. J.


SLOUGH _____

      J.