Filed 8/28/24 In re F.S. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re F.S., a Person Coming Under the Juvenile Court Law. | B330246<br>(Los Angeles County Super. Ct. No. 22CCJP02443A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ELIZABETH S.,<br><br>    Defendant and Appellant. | |
| ELIZABETH S.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY<br><br>    Respondent, | B334677<br>(Los Angeles County Super. Ct. No. 22CCJP02443B) |

LOS ANGELES COUNTY
DEPARTMENT OF CHILDREN
AND FAMILY SERVICES et al.,

    Real Parties in Interest.

 

     APPEAL (B330246) from an order of the Superior Court of Los Angeles County, Pete R. Navarro, Juvenile Court Referee. Affirmed.

     ORIGINAL PROCEEDINGS (B334677); writ petition to review order setting hearing under Welfare and Institutions Code section 366.26, Pete R. Navarro, Juvenile Court Referee.  Petition denied.

     Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant, Appellant, and Petitioner.

     Office of the County Counsel, Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Senior Deputy County Counsel, for Plaintiff, Respondent, and Real Party in Interest Los Angeles County Department of Children and Family Services.

     Children's Law Center and Sarah Liebowitz for Real Party in Interest K.S.

     No appearance by Respondent The Superior Court of Los Angeles County.

————————————

## *INTRODUCTION*

Elizabeth S. (Mother) appeals (B330246) from a juvenile court order denying her petition under Welfare and Institutions Code section 388 seeking reunification services for her daughter, F.S.[1] The court had previously denied Mother the services under section 361.5, subdivision (b)(5), after determining F.S. came within the court's jurisdiction under section 300, subdivision (e), as a child under age five who was the victim of severe physical abuse. In denying Mother's section 388 petition, the court concluded Mother had shown neither a change of circumstances nor that providing her with reunification services would be in F.S.'s best interest. We affirm.

In a separate original proceeding (B334677), Mother seeks extraordinary writ relief from the juvenile court's order denying her reunification services for her second daughter, K.S., who was born during the proceedings regarding F.S. Because Mother was not receiving services for F.S., the court concluded services need not be provided for K.S. under section 361.5, subdivision (b)(7). The court's decision is supported by substantial evidence. Thus, we deny Mother's writ petition.[2]

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] On our own motion, we consolidate Mother's separate proceedings for purposes of this opinion only.

## FACTUAL AND PROCEDURAL BACKGROUND

1. ***Dependency Jurisdiction Over F.S. Under Section 300, Subdivisions (a), (b), and (e)***

F.S. came to the attention of the Los Angeles County Department of Children and Family Services (Department) on June 17, 2022, when Mother brought F.S. to a medical clinic. Mother informed the health care provider that she had accidentally dropped seven-month-old F.S. on June 4, and that F.S. had since stopped using her right arm or crawling and had developed a lump on her right clavicle. Mother explained she did not seek medical attention earlier because the family had recently moved to California.

Finding the injuries were more indicative of abuse than an accident, the clinic transferred F.S. to an emergency room for further medical evaluation. At the hospital, doctors discovered F.S. had a dislocated hip and fractures in her skull, ribs, clavicle, femur, tibia, and humerus. These fractures were in different stages of healing. F.S. also had bruising on her body. She required intravenous fluid because she was not eating. A doctor opined that the injuries to F.S.'s femur could have significant effects on her gait in the future.

At the hospital, the Department and law enforcement interviewed Mother and F.S.'s father, Edgar S. (Father).

Mother repeated that she dropped F.S. while carrying her from her crib to the changing table. According to Mother, F.S. landed on her right side, and Mother later noticed some bruising on the child's elbow and hairline but no bleeding. After she informed Father, together they decided not to seek medical attention because they saw no sign of other injuries. Later that day, Mother noticed F.S. was unable to crawl, and a few days

4

later, Mother noticed she was not moving much at all.  Despite this behavior, Mother waited until Father's new medical insurance card arrived in the mail before making an appointment at the clinic.

In his separate interview, Father stated that in early May he was playing with F.S. while Mother was showering.  According to Father, he was swinging F.S. up and down when she fell out of his hands and flew five feet before landing on the floor and hitting her head on the crib.  F.S. cried for 10 to 20 minutes.  Father gave her pain medication but did not see any injuries or bleeding.  After Mother finished showering, Father told her that F.S. had fallen out of his hands while he was playing with her.  A week later, Mother informed Father that F.S. had bruising all over her head.  Even so, they did not seek medical attention because F.S. had only shown discomfort for the first few days after the incident.  But when Father noticed a bump on F.S.'s clavicle, they finally sought medical attention.

Father was arrested for child endangerment.  Before the arrest, Father told Mother, "It is okay you do not have to protect me just tell the truth."  Thereafter, Mother told law enforcement that Father had dropped F.S., and that Mother had not taken F.S. to the hospital sooner because Father did not let her and she "obeyed him."

F.S. was detained and placed with her maternal grandparents, with monitored visitation for Mother and Father.

In another interview with the Department, Mother reported she was "shocked" when she learned of F.S.'s injuries at the hospital.  Since his arrest, Father had told her he was "responsible for those injuries," noting "that he lost his temper during those times; that he shouldn't have done that to her and

that he's going to take full responsibility for what he has done." Mother explained she and Father had physically separated on the advice of legal counsel but they still talked and checked in on each other. Despite her separation from Father, Mother intended to remain unemployed and planned to be a stay-at-home wife.

In his interview, Father confirmed Mother's account that the incident occurred on June 4, 2022, and not early May as he had originally reported. Father shared his desire for Mother to have custody of F.S., explaining that he was the problem and Mother was innocent, and that he was controlling of Mother and kept her from seeking treatment for F.S. because he did not want his actions to be discovered. He also explained that he and Mother had separated on the advice of church elders. He indicated Mother had forgiven him and that they still loved each other and wanted to be together.

In a search of Mother's phone, law enforcement discovered notes Mother had written questioning whether F.S.'s neck was injured based on her limited movement and documenting that F.S. was "bruised everywhere" and crying when Mother sat her up, moved her back, or extended her hands and feet. Law enforcement also found photos on Mother's phone that appeared to show F.S. with her arm in a homemade sling, as well as a video showing F.S. crawling using only one arm while Mother commented that it was amazing she was doing so without crying.

Mother and Father were each charged with one count of misdemeanor child endangerment (Pen. Code, § 273a, subd. (a)). Criminal protective orders prevented the parents from having contact with F.S. except during their monitored visitation.

After a September 20, 2022 jurisdiction hearing, the court took jurisdiction under section 300, subdivisions (a), (b), and (e),

6

sustaining the following allegations:  Both parents committed "deliberate, unreasonable and neglectful acts" that caused serious injuries to F.S., and both knew or should have known F.S. was being physically abused but did not take action to protect her; both parents failed to obtain timely medical treatment for her; and Father's mental health condition (i.e., schizophrenia) endangered F.S. and Mother knew of that danger and failed to protect F.S.

2.     ***F.S.'s Disposition Hearing and Denial of Reunification Services for Mother***

The Department recommended the dependency court deny both parents reunification services under the so-called "bypass provision" of Welfare and Institutions Code section 361.5, subdivision (b)(5), which provides that "[r]eunification services need not be provided to a parent . . . when the court finds, by clear and convincing evidence, . . . [t]hat the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 [for severe physical abuse of a child under age five] because of the conduct of that parent . . . ."  Because reunification services may only be provided in this situation where the court finds the services are "likely to prevent reabuse or continued neglect of the child or that failure to try reunification would be detrimental to the child because the child is closely and positively attached" to the parent (Welf. & Inst. Code, § 361.5, subd. (c)(3)), the court appointed an expert under Evidence Code section 730 to examine Mother and Father and their relationships with F.S. and provide an opinion on these subjects.

Following evaluations of the parents and observations of their interactions with F.S., the expert found Mother exhibited poor insight and impaired judgment that "decrease[d] her ability

7

to keep [F.S.] safe." The expert noted Mother took no accountability for her role in F.S.'s injuries and continually changed her story. The expert observed Mother "displayed a pattern of making conflicting statements about the incidents making it difficult to gauge the credibility of her statements." The expert determined Father had an underlying mental illness that may have been affecting his ability to appreciate the gravity of the situation, and Mother minimized his mental health history by stating Father "pretended to have mental illness to get out of the [Navy]." The expert opined there was a "high" likelihood that F.S. would suffer physical or emotional abuse if returned to her parents, and that if reunification services were provided, the expert's prognosis that the parents would benefit from such services was "guarded" based on the case history.

The expert assessed that F.S.'s attachment to both Mother and Father was "not strong." The expert observed that F.S. "responded to [Father's] presence with tears and appeared to be [in] distress throughout the session." F.S. also "cried and appeared to be in distress when alone with mother," and she "struggled in responding in a playful manner to mother and only became more comfortable and playful when [the maternal] grandmother joined in the session and held her." To that end, the expert assessed that F.S. had "a strong and nurturing bond with maternal grandmother."

At the disposition hearing held on November 16 and 17, 2022, Mother submitted evidence of her petition for legal separation from Father filed on October 5, 2022, as well as evidence of her participation in individual psychotherapy, parenting classes, and church-affiliated counseling since August 2022.

Mother also testified, explaining she was "in shock" to learn that Father may have injured F.S. at times other than when he dropped her on June 4, 2022. When asked about the photos showing a homemade sling, Mother stated she had wrapped F.S.'s arm "to prevent further injury." Mother then said she did not know if F.S. was injured at the time, and later said that she was not aware of any injuries before she took F.S. to the clinic on June 17, 2022. Mother explained that reuniting with Father was "not an option right now," but that she was still in communication with him.

The juvenile court ordered F.S. removed from Father and Mother and ordered monitored visitation for both parents. The court denied both Father and Mother reunification services under section 361.5, subdivision (b)(5), finding by clear and convincing evidence that F.S. was brought within the jurisdiction of the court under section 300, subdivision (e), because of the conduct of both parents. Further, although the court recognized both parents presented evidence that they had enrolled in programs and were beginning to address their issues, the court indicated it was unable to find pursuant to section 361.5, subdivision (c)(3), that reunification services for either parent were in F.S.'s best interest or likely to prevent further abuse, or that the failure to try reunification would be detrimental to F.S. because she was closely and positively attached to either parent.

3.   *K.S.'s Birth and Detention*

Mother gave birth to K.S. in February 2023. The Department learned of K.S.'s birth two weeks later during a home visit with the maternal grandparents. Mother reported the child was Father's and that Father was helping her financially, in communication with her, and present when K.S. was born.

Although Mother claimed Father's only contact with K.S. was at the hospital when Mother gave birth, the Department obtained records showing K.S. was not born at the hospital as well as reports from Mother's neighbors that Father had recently been seen on multiple occasions at her apartment  Thereafter, Mother admitted K.S. was born at home with Father present, and that he had visited the home and K.S. since her birth.  K.S. was detained and placed with her maternal grandparents along with F.S.

4.      ***Section 388 Petition***

In March 2023, Mother filed a petition under section 388 seeking modification of the order at disposition denying her reunification services for F.S.  Mother sought reunification services on the basis of her completion of 25 parenting classes and participation in therapy and counseling, her continued separation from Father, and her visitation and bond with F.S.[3]

In its response, the Department reported that neither the instructor for Mother's parenting classes nor her counselor responded to the Department's attempts to contact them.  The Department also reported that Mother's former psychotherapist had "concerns about [Mother]" but could not elaborate as Mother had not consented to her speaking with the Department.  The letter submitted from Mother's current therapist did not reference the underlying issues and said only that Mother was being treated for stress management due to court involvement and the removal of her children.

---

[3]      Mother also requested that the maternal grandparents be permitted to monitor her visits with F.S., but Mother does not now seek reversal of the denial of that request.

The Department also explained that Father was reporting he lived at an address that corresponded to a vacant apartment where work was being done, and that Mother's neighbors recently witnessed Father coming to her apartment.

The Department reported difficulties in coordinating visitation for the parents with F.S. because the parents did not want to use Department-provided monitors and even rejected volunteers from their church. The Department assessed that Mother's visits with F.S. mostly went well. However, one church-affiliated monitor observed F.S. run from Mother, further describing F.S. as "very stand-offish with her mother. She did not go to her mom, but her mom reached out and the kid turned away. She seemed a little more secure with the [maternal] grandpa."

Following another interview with Mother, the Department expressed concern that Mother was recanting and contradicting some of her prior statements as well as minimizing F.S.'s injuries, Father's actions in causing those injuries, and her role in failing to seek timely medical attention for them. For instance, Mother said F.S. "had an accident" on June 4, 2022, the day Father had admitted he injured F.S. The Department determined Mother was "even more protective" of Father than she had been initially. The Department assessed Mother as not credible.

Thereafter, against his counsel's advice, Father further disclosed to the Department how F.S. sustained her injuries. Father explained that, starting in March 2022, he would handle the child roughly in an attempt to stop her from crying. He stated, "I would hurt her, take her from her crib by squeezing her. I would change her (diaper) and was squeezing with my

11

hands, bending and twisting her arms and legs so she would stay still and not cry. I did the same thing while swaddling her. I would squeeze her upper torso into my chest." On June 4, 2022, after F.S. started crying when she saw him, he started spinning her in a circle while holding onto her ankles with his arms out straight. After a few spins, Father continued, "My hands gave out and she launched from my hands and hit the crib." F.S. "started crying hard," and Father gave her pain medication and told Mother he dropped the child. Father stated he should have listened to Mother and sought immediate medical attention, but he also said he and Mother checked the baby and determined she was not injured.

After Father's disclosure, the district attorney upgraded Mother's and Father's criminal charges to felonies.

On May 10 and 25, and June 14, 2023, the court held a hearing on Mother's section 388 petition, during which the parents testified and presented witnesses.[4] The Department and F.S.'s counsel opposed Mother's petition.

Dr. Shelbi Cullen testified she provided Mother lay biblical counseling through the parents' church for several months and also monitored some of Mother's visits with F.S. Dr. Cullen said she only observed positive interactions between Mother and F.S. She testified Mother and Father continued to be together in church.

John Ford, who met Father and Mother through their church, testified that he monitored five to seven visits for Mother.

---

[4]    Father also filed a section 388 petition seeking reunification services for F.S. The court considered (and denied) Father's petition at the same hearing as Mother's. Father voluntarily dismissed his appeal from the denial of his petition.

F.S. was happy during the visits, and Ford had no concerns about Mother's care of F.S.

The Department stipulated that another visitation monitor, Laurinda Keys, also had positive reports about the visits between Mother and F.S.

The maternal grandfather testified that he monitored Mother's daily video calls to F.S. that usually lasted 10 to 15 minutes. He stated F.S. would ask for Mother four to five times a day and called her "Mom."

Department caseworker Genesis Haddad, who had been assigned to the case since June 2022, testified that Mother visited with F.S. at least once a week, and Mother had attended all of F.S.'s medical appointments. Haddad testified that three different visitation monitors had reported that during the visits F.S. would walk back to the maternal grandparents rather than stay with Mother.

Matthew Heller, Father's biblical counselor, testified that he had a meeting with Mother and Father to discuss their relationship. Mother had indicated she was interested in reconciling with Father.

In Mother's testimony, she stated she generally visited with F.S. a few times a week at a playground inside a mall, and that F.S. would come to her for comfort during the visits. Mother played games with her and offered her snacks. During Mother's nightly video chats with F.S. before bedtime, Mother would sing songs or dance with F.S.

Mother testified she had attended about 30 parenting classes. Her insurance for therapy sessions had run out but she hoped to attend more sessions to help her cope with stress and anxiety from her dependency case.

Mother stated that, although she did not believe in divorce, she was legally separated from Father and had not resided with him since July 2022. She still met up with Father to attend church with him, and she also saw him during weekly Bible studies. She stated Father had found a new place to live, and the only time he had come to Mother's apartment was for her labor with K.S. and K.S.'s birth.

Mother testified she was angry with Father, and she was "in shock" when she read his recent confession. She said she wanted to take F.S. to the hospital the day she was injured but did not do so.

The court denied Mother's petition, concluding Mother had shown neither a change of circumstances nor that providing her with reunification services was in F.S.'s best interest. The court found Mother extremely passive and subservient, with questionable protective capacities. It further noted that the witnesses called by Mother and Father were all fellow church members who would be expected to "speak positively" about Mother and Father. The court indicated these witnesses had focused on the parents instead of F.S., and they provided no clinical evidence to assist the court in deciding what was in F.S.'s best interest.

Mother timely appealed from the order denying her petition.

5. ***Proceedings Regarding K.S.***

In March 2023, the Department filed a petition alleging under section 300, subdivisions (a), (b), and (j), that K.S. was at serious risk of harm based on Mother's and Father's abuse of and failure to protect F.S. The Department recommended that reunification services be denied to Mother and Father under

14

section 361.5, subdivision (b)(7), which provides in part that the court need not provide reunification services if "the parent is not receiving reunification services for a sibling of the child" pursuant to section 361.5, subdivision (b)(5). The Department cited Mother's coverup of Father's abuse of F.S., the parents' knowledge of F.S.'s injuries and refusal to pursue medical attention promptly, and Father's continuing and controlling relationship about which Mother was deceitful. The Department reported that Mother's service providers either had not responded to the Department's contact attempts or did not have Mother's consent to communicate with the Department.

In August 2023, Father pleaded no contest in criminal court to one count of felony child endangerment causing great bodily injury. The court sentenced him to 364 days in county jail and five years of formal probation, and it issued a 10-year criminal protective order that prohibited Father from having any contact with F.S. Mother pleaded no contest to one count of misdemeanor child endangerment. She was placed on summary probation and ordered to complete 52 weeks of parenting and domestic violence classes. The court also issued a 10-year criminal protective order that prevented Mother from having any contact with F.S. except for visitation ordered by the juvenile court. The district attorney expressed concern to the Department that Mother was "still adamant that she did not know anything" about Father's abuse and did not "fully understand that she was wrong in this situation."

On January 11, 2024, at a combined jurisdiction and disposition hearing, the court sustained the allegations against Mother and Father and ordered that neither receive reunification services for K.S. under section 361.5, subdivision (b)(7).

After the court set a permanency hearing under section 366.26, Mother timely filed a petition for extraordinary writ. We issued an order to show cause, stating our intention to decide the matter on the merits. (Cal. Rules of Court, rule 8.452(h).)

## DISCUSSION

1. ***The Juvenile Court Did Not Abuse Its Discretion in Denying Mother's Section 388 Petition Seeking Reunification Services With F.S.***

   ### A. **Applicable law and standard of review**

   Section 388 allows a parent to request modification of a prior order based on changed circumstances or new evidence. (§ 388, subd. (a)(1).) When the juvenile court has previously denied a parent reunification services under section 361.5, subdivision (b)(5), however, the parent's burden in bringing a section 388 petition requesting reunification services is heightened.

   First, the parent must show by clear and convincing evidence that the proposed modification is in the best interests of the child. (§ 388, subd. (a)(2) ["When any party . . . petitions the court . . . to modify the order that reunification services were not needed pursuant to paragraphs (4), (5), and (6) of subdivision (b) of Section 361.5 . . . , and the court orders a hearing . . . , the court shall modify the order that reunification services were not needed . . . only if the court finds by clear and convincing evidence that the proposed change is in the best interests of the child."]; Cal. Rules of Court, rule 5.570(h)(1)(C).)

   Second, the juvenile court may not grant a section 388 petition requesting reunification services when services were bypassed under section 361.5, subdivision (b)(5), unless the

16

requirements of section 361.5, subdivision (c), are met.  (*In re A.M.* (2013) 217 Cal.App.4th 1067, 1075-1076 & fn. 2; see § 361.5, subd. (c).)  Thus, reunification services may be granted only where the court "finds that, based on competent evidence, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent."  (§ 361.5, subd. (c); *In re A.M.*, at p. 1076 & fn. 2 [a parent cannot "evade the requirements of section 361.5, subdivision (c), merely by waiting a few months and then seeking relief under section 388"]; see *In re G.B.* (2014) 227 Cal.App.4th 1147, 1158 [once the bypass provision of § 361.5, subd. (b)(5), has been found to apply, "a juvenile court may modify an order denying reunification services only if there is clear and convincing evidence that the services would be in the child's best interests, and only if it makes the same findings that would have been required to offer services at the disposition hearing instead of bypassing services"].)

In assessing the best interests of the child for purposes of a section 388 petition, the juvenile court must focus on the needs of the child rather than the parent's interests in reunification.  (*In re G.B.*, *supra*, 227 Cal.App.4th at p. 1163; see also *In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  "[T]he petitioner must show changed, not changing, circumstances.  [Citation.]  The change of circumstances or new evidence 'must be of such significant nature that it requires a setting aside or modification of the challenged prior order.' "  (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.)

We review the denial of a section 388 petition for abuse of discretion.  (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1194.)

## B.    Mother did not show changed circumstances

Mother failed to support her section 388 petition with evidence showing circumstances had meaningfully changed since the juvenile court denied her reunification services at F.S.'s disposition hearing.

At the time of the disposition hearing, Mother was enrolled in parenting classes, therapy with a licensed psychotherapist, and church counseling.  She was visiting F.S., with some monitors observing positive interactions and others—notably, the court-appointed expert—observing the absence of a strong bond.  Mother asserted she had physically and legally separated from Father, and that she intended to remain separated from him.

Five months later, Mother based her section 388 petition on evidence showing the following:  She had continued attending parenting classes, therapy with a licensed therapist, and church counseling.  She had continued visiting F.S., with some monitors observing positive interactions and others observing the absence of a strong bond.  And she had continued her legal separation from Father.

Even if Mother made progress in her case plan, Mother did not explain how these circumstances were materially different from those that existed when the juvenile court denied her reunification services only five months earlier.  (See *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 ["To support a section 388 petition, the change in circumstances must be substantial."]; *In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 615 [change must be "significant"].)

18

C.   **Mother did not prove that reunification services would be in F.S.'s best interest**

Even assuming Mother based her petition on changed circumstances, Mother did not show by clear and convincing evidence that providing her with reunification services would be in F.S.'s best interest. While she continued to attend parenting classes, therapy, and counseling, none of her service providers opined that Mother had learned to accept responsibility for her role in F.S.'s abuse or establish boundaries that would ensure the child's safety in the future. The court observed Mother still had a passive and subservient mindset.

In addition, it was far from clear that Mother and Father had in fact separated. Since the disposition hearing, Mother and Father attended church and weekly Bible studies together. They participated in joint counseling sessions with discussions of their relationship and plans for and efforts toward reconciliation. Father came to Mother's apartment and medical appointments while she was pregnant with her second child. He was present at Mother's apartment when she gave birth to K.S., as well as the hospital where Mother and K.S. were later taken. Father visited Mother's apartment after K.S. was born. He continued to visit her apartment after K.S. was detained. And Mother had admitted she was interested in reconciling with Father and acknowledged her separation from him was solely a product of legal advice. Evidence of Mother's ongoing relationship with Father strongly supported a finding that reunification services would be unlikely to prevent F.S.'s reabuse and that failing to try reunification would not be detrimental to F.S. (See *In re A.A.* (2012) 203 Cal.App.4th 597, 612 [modification of a prior order is justified only where "the problem that initially brought the child

within the dependency system [is] removed or ameliorated"]; see also *In re A.M.*, *supra*, 217 Cal.App.4th at pp. 1075-1076 [§ 361.5, subd. (c)(3), requirements still apply when reunification services are sought through a section 388 petition].)

Furthermore, so long as Mother remained with Father, her reunification with F.S. would not be possible. As a result of his felony conviction, Father was subject to a 10-year criminal protective order that prohibited all contact with F.S. Under those circumstances, providing Mother with reunification services would result in a needless delay of permanence and stability for F.S. (See *In re Jayden M.* (2023) 93 Cal.App.5th 1261, 1275 [finite social services are to be reserved "for those cases where reunification is likely rather than 'fruitless' "].)

Moreover, after the disposition hearing, Mother continued to hinder the Department's investigation by withholding information and providing inconsistent statements. She failed to disclose the birth of her second child, and when questioned by the Department, falsely stated that K.S. was born in a hospital when in fact Mother gave birth to K.S. at home. She lied and withheld information regarding Father's visits to her home around the time K.S. was born. And she minimized F.S.'s injuries and denied facts she had previously admitted, including that she had seen signs of F.S.'s injuries. Mother's lack of candor supported the court's determination that she failed to carry her burden to show by clear and convincing evidence that reunification services were in F.S.'s best interest.

Finally, notwithstanding some evidence of Mother's positive interactions with F.S., other evidence showed F.S. was not bonded with Mother and preferred to be with her maternal

grandparents with whom she was strongly bonded and who were willing to adopt her.

The juvenile court did not abuse its discretion in denying Mother's section 388 petition.

2.      ***The Juvenile Court Properly Denied Mother Reunification Services for K.S.***

Section 361.5, subdivision (b)(7), provides that reunification services need not be provided to a parent where "the parent is not receiving reunification services for a sibling or half sibling of the child pursuant to paragraph (3), (5), or (6)." In that instance, the juvenile court may still order reunification services if the parent proves by clear and convincing evidence that reunification is in the best interest of the child. (§ 361.5, subd. (c)(2); see *In re T.R.* (2023) 87 Cal.App.5th 1140, 1148.)

In making this determination regarding the child's best interest, "the court shall consider any information it deems relevant, including the following factors: [¶] (1) The specific act or omission comprising the severe sexual abuse or the severe physical harm inflicted on the child or the child's sibling or half sibling. [¶] (2) The circumstances under which the abuse or harm was inflicted on the child or the child's sibling or half sibling. [¶] (3) The severity of the emotional trauma suffered by the child or the child's sibling or half sibling. [¶] (4) Any history of abuse of other children by the offending parent or guardian. [¶] (5) The likelihood that the child may be safely returned to the care of the offending parent or guardian within 12 months with no continuing supervision. [¶] (6) Whether or not the child desires to be reunified with the offending parent or guardian." (§ 361.5, subd. (i).)

We review for substantial evidence a determination that section 361.5, subdivision (b)(7), applies. (*In re A.G.* (2012) 207 Cal.App.4th 276, 283; *Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96.) We review the determination that reunification would not be in the child's best interest for an abuse of discretion. (*In re A.G.*, at p. 283.)

It is undisputed Mother was not receiving reunification services for F.S. pursuant to section 361.5, subdivision (b)(5), such that the bypass provision of subdivision (b)(7) is applicable to K.S.

In weighing whether reunification services were nevertheless in K.S.'s best interest, the juvenile court considered the Department's reports from the earlier proceedings regarding F.S., which documented Father's severe physical abuse of F.S., both parents' failure to pursue prompt medical attention for her injuries, and both parents' continued failure to fully cooperate in an investigation of that abuse and accept responsibility for their actions. The reports also indicated that, despite telling the Department otherwise, Mother was continuing her relationship with Father and providing him with access to her home and K.S. before K.S. was detained. Since those reports were filed, Mother and Father were convicted of child endangerment charges, and Father was ordered to have no contact with F.S. for 10 years. The prosecutor expressed concern that Mother still did not recognize her role in F.S.'s abuse.

While Mother asserts she should receive services because K.S. was not subject to physical abuse like F.S., a court "need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." (*In re I.J.* (2013) 56 Cal.4th 766, 773.) The evidence regarding F.S.'s

abuse and Mother's unwillingness to fully appreciate her role in that abuse supports the juvenile court's finding that reunification would not be in K.S.'s best interest. (§ 361, subd. (i)(1)-(5).)

Moreover, despite presenting evidence showing she attended parenting classes and counseling, Mother did not establish how these services would ensure K.S.'s safety upon reunification. Mother also did not allow her therapists to share any information with the Department.

Finally, having spent almost her entire life outside of Mother's care, K.S. has bonded with her maternal grandmother. Continued placement with her maternal grandparents would likewise keep K.S. with her sister.

In sum, substantial evidence supported the juvenile court's determination that reunification services need not be provided under section 361.5, subdivision (b)(7), and the court did not abuse its discretion in determining that Mother failed to prove that providing those services would be in K.S.'s best interest.

### *DISPOSITION*

The order denying Mother's section 388 petition is affirmed. Mother's writ petition is denied.


STONE, J.

We concur:




MARTINEZ, P. J.                    FEUER, J.